EDMUND B. LEAMING, VIVIAN M. LEWIS, JOHN H. BACKES, JOHN GRIFFIN, JOHN E. FOSTER, MALCOLM G. BU-CHANAN, JAMES F. FIELDER, ALONZO CHURCH, ROBERT H. INGERSOLL AND JOHN BENTLEY, VICE-CHANCELLORS.

---

CLARENCE E. SMILEY, complainant,

*v.*

MAY B. HANNA et al., defendants.

[Decided May 1st, 1923.]

1. Two assignments of a mortgage, both purporting to have been made by C. E. S. to J. R. W., to which U. G. S., a master in chancery, signed the name of C. E. S., without his authority or knowledge, but on request of a third party who claimed to be the beneficial owner

of the mortgage, and signed his name as subscribing witness thereto, and filled out and signed the usual form of acknowledgment thereunder, in which he certified that personally appeared before him C. E. S., who he was satisfied was the grantor in the instrument named, and having first made known to him the contents thereof, he acknowledged that he signed, sealed and delivered the same as his voluntary act and deed, all of which was certified and signed U. G. S., M. C. C. of N. J., is malpractice, for which the commission of the master will be revoked and canceled.

2. *Semble:* the above recited acts constitute contempt of court.

On petition to open decrees and to set aside a sheriff's deed.

*Mr. William M. Clevenger,* for the petitioner.

*Mr. Ulysses G. Styron* and *Mr. John W. Wescott,* for the complainant.

WALKER, CHANCELLOR.

This was a suit for foreclosure of a mortgage for $4,000, in which final decree was made and entered October 25th, 1920, and sale of the mortgaged premises was made December 15th, 1920. On November 27th, 1922, a petition was filed by Narcia R. Wills, administratrix of John R. Wilson, deceased, alleging that on January 6th, 1919, the complainant, in consideration of $350, assigned to the petitioner's intestate the bond and mortgage then in suit, which was made by Annie E. Walters to him, Clarence E. Smiley, by assignment in writing acknowledged but not recorded, and that on May 28th, 1919, he again assigned the same mortgage to petitioner's intestate in consideration of $1,085, which was likewise acknowledged, and was recorded in the Atlantic county clerk's office in Book 51 of Assignments of Mortgages, page 29: that petitioner's intestate departed this life July 30th, 1922, and on August 4th, 1922, she was appointed administratrix of his estate, and immediately qualified and took upon herself the burden of administering his affairs, and found the assignments just mentioned among decedent's effects; that so far as petitioner had been able to ascertain, no part of the mortgage was ever paid or satisfied to John R. Wilson in his

lifetime, and that it had not been paid to petitioner since his death; that petitioner's intestate was not a party to the fore-closure suit conducted by the complainant and was without knowledge of its prosecution. The prayer is for opening of the decrees (final and interlocutory) and for setting aside the sheriff's deed.

The petitioner failed in her proofs. In fact it was affirmatively shown that the moneys procured upon the assignments were paid to Dr. Edwin R. Smiley, who claimed to be the beneficial owner of the mortgage, and were afterwards repaid by him to Mr. Wilson through Mr. Styron as attorney. Therefore, the petition must be dismissed. But in the trial of the issue an amazing situation was developed, which I shall now proceed to narrate.

Mr. Styron, solicitor for the complainant, was called as a witness on behalf of the petitioner, and was examined concerning the assignments of the mortgage above mentioned. They were produced and offered in evidence and marked *Exhibits P-2* and *P-3,* respectively. *P-2* purports to be an assignment of a mortgage made by Clarence E. Smiley for $350 to John R. Wilson. It is drawn on the usual printed blank form, and the manuscript portion, including the name of the assignor, Clarence E. Smiley, is all in the handwriting of Mr. Styron, who, at the foot thereof, signed his name as subscribing witness thereto, filled out the usual printed form of certificate so that it read that before him personally appeared Clarence E. Smiley, who, he was satisfied, was the grantor in the instrument named, and having first made known to him the contents thereof, he acknowledged that he signed, sealed and delivered the same as his voluntary act and deed, all of which was thereby certified, and he signed the same, "U. G. Styron, M. C. C. of N. J."

*P-3* purports to be an assignment of a mortgage made by Clarence E. Smiley to John R. Wilson. It is drawn on the usual printed blank form and the blanks are filled in in typewriting, and the name of the assignor, Clarence E. Smiley, is in the handwriting of Mr. Styron, who, at the foot

thereof, signed as subscribing witness, and also signed the usual certificate of acknowledgment, which was in printing and typewriting, and certified the same as in the certificate to *P-2*. Mr. Styron's examination at this point proceeded as follows:

Direct examination by Mr. Clevenger.

"*Q.* Mr. Styron, I show you *Exhibit No. 2* for identification. being an assignment of mortgage by Clarence E. Smiley to John R. Wilson, dated January 6th, 1919, and ask you if that is your signature as subscribing witness thereto?

"*A.* Yes.

"*Q.* I show you *Exhibit P-3* for identification, being assignment of mortgage dated May 28th, 1919, and ask you if that is your signature as subscribing witness thereto?

"*A.* Yes.

"*Q.* Now, I show you both exhibits, and ask you if you took the acknowledgments to those papers?

"*A.* I did.

"*Q.* Did you see Clarence E. Smiley sign his name to each of the papers?

"*A.* No, he didn't sign his name to either of them.

"*Q.* Who did sign his name?

"*A.* I did.

"*Q.* Was Mr. Smiley present at the time of the execution of the papers?

"*A.* He was not.

"*Q.* Did you have a power of attorney to sign those papers for him?

"*A.* Not from him, no.

"*Q.* Did he authorize you to sign his name to the papers?

"*A.* Not personally.

"*Q.* Whose acknowledgment did you take to the papers?

"*A.* No acknowledgment at all; simply filled it in and signed it.

"*Q.* Did you deliver the original bond and mortgage, offered in evidence, and the two assignments, to John R. Wilson?

"*A.* Yes.

\* \* \* \* \* \* \* \* \*

"*Q.* Now, when you got the $350 on the first assignment, was that delivered to Clarence E. Smiley?

"*A.* No, Clarence E. Smiley knew nothing of that transaction, so far as I know; everything was done through his father, Edwin R. Smiley.

"*Q.* When you got the balance of the $1.085 named in the ssecond assignment, was that money delivered to Clarence E. Smiley?

"*A.* It was not—not by me.

"*Q.* Did Mr. Wilson understand that he was getting two assignments not executed by Clarence E. Smiley.

"*A.* He did.

"*Q.* Who owned the bond and mortgage that was assigned?

"*A.* At that time I supposed that Edwin R. Smiley owned it; I have since learned that it was owned by Clarence E. Smiley.

"*Q.* Did Mr. Wilson understand that it was owned by Dr. E. R. Smiley?

"*A.* Yes.

"*Q.* Did you assure Mr. Wilson that it was owned by Dr. E. R. Smiley?

"*A.* I told him so, yes; all the transactions that I had had——

"*Q.* Why didn't you get Dr. Smiley's signature to the assignments?

"*A.* Why didn't I?

"*Q.* Yes.

"*A.* I didn't think it was necessary; he told me to sign the name of Clarence E. Smiley.

"*Q.* Dr. Smiley did?

"*A.* Yes.

"*Q.* And you thought that was all right?

"*A.* It was all right.

"*Q.* Under what theory?

"*A.* Upon the theory that if he owned the mortgage and had it in the name of someone else, he could certainly direct how it should be ordered.

"*Q.* You think he could direct you to sign Clarence E. Smiley's signature to that?

"*A.* Yes.

"*Q.* And you can certify that Clarence E. Smiley had acknowledged it as his act and deed?

"*A.* Well, that was a rather foolish thing to do; I did it just the same; it was a transaction between friends; there is no justifying that feature of it that I can see."

\*     \*     \*     \*     \*     \*     \*     \*     \*

## Cross-examination by Mr. Wescott.

"*Q.* Mr. Styron, how long have you been a member of the New Jersey bar?

"*A.* Since 1885.

"*Q.* And Edwin R. Smiley, how long did you know him?

"*A.* I have known him for at least thirty years.

"*Q.* How well?

"*A.* Very well.

"*Q.* On intimate terms with him?

"*A.* Yes.

"*Q.* How long did you know Mr. Wilson?

"*A.* I had known Mr. Wilson, I presume, for at least fifteen years.

"*Q.* On what terms of intimacy with him were you?

"*A.* Quite intimate with him for the last seven or eight years.

"*Q.* Will you explain to his honor, the chancellor, how these transactions came about, and give us the history of it, so far as you can recollect, as briefly as possible?"

Mr. Styron then went on to explain the transaction as follows: He said that in 1916 Dr. Edwin R. Smiley's sister, Mrs. Walters, owned a property in Ventnor City on which there was a mortgage, and the doctor told him, Styron, he was about to take it up and sent him a check to the order of the solicitor of the mortgagee, and took from his sister a mortgage of $4,000, which is the one which was foreclosed in the name of Clarence E. Smiley, the son of Dr. Edwin R. Smiley (in whose name the mortgage was taken). Annie E. Walters, the doctor's sister, died, and he commenced foreclosure on the mortgage through Mr. Styron. The doctor wanted to get some money on the mortgage, and Mr. Styron went to petitioner's intestate, John R. Wilson, and told him the circumstances and got from him $350 for Dr. Smiley. Clarence E. Smiley, the doctor's son, was then ill somewhere in a sanitorium. A little later Dr. Smiley wanted some more money and Mr. Styron got $1,085 for him from Mr. Wilson. When he got the first money he signed a note in the name of Clarence E. Smiley. He had never seen his signature and did not know what it looked like and made no attempt to imitate it. The mortgage was in his name, but Mr. Wilson understood that it belonged to Dr. Edwin R. Smiley, and so did the witness, Mr. Styron.

It was proved by the testimony of Mr. Styron, and by vouchers, that Mr. Wilson was repaid in full through Mr. Styron, but the assignments, which were made as collateral to secure the loans, were not re-delivered.

*In re Breidt and Lubetkin, 84 N. J. Eq. 222,* I had before me a case of malpractice by two solicitors of this court. Lubetkin filed a bill for a receiver with three affidavits annexed purporting to have been sworn to before Breidt. Sundry affidavits were presented on the application. The principal one, made by Greenbaum, was actually sworn to before Breidt. Another affidavit bearing the signature of

Greenbaum, and seven or eight other supposed affidavits, were certified by Breidt as being sworn to before him. None of these affiants except Greenbaum appeared before Breidt and made oath as attested by the jurats. What occurred was this: Lubetkin, who was an office associate of, but not professionally connected with, Breidt, went to him with Greenbaum and asked that he, Breidt, take the latter's affidavit, and also that he subscribe the jurats to the other affidavits, stating that he, Lubetkin, had seen the other persons sign and had sworn them, and that being the solicitor, he could not sign the jurats, and to oblige Lubetkin, he, Breidt, took the papers, administered the oath to Greenbaum, and then signed his name to all the jurats and handed the papers back to Lubetkin. Lubetkin admitted that he did not see three of the affiants, but as to the others he stated that he took their affidavits and later discovered that as solicitor in the cause it would be irregular to subscribe the jurats, and he asked Breidt to do so, stating that he had actually seen four of the affiants sign and took their affidavits, and Greenbaum told Breidt that he, Greenbaum, had seen the other three affiants sign and had explained the contents of the bill and affidavits to them and had told them the nature of the papers they were signing, and that thereupon Breidt swore Greenbaum and affixed his signature to the three affidavits. The defence of these young men was confession and avoidance; the avoidance, however, not constituting a defence. They only alleged and urged ignorance of the law and practice relating to the administration of oaths and the certification thereof by way of jurat, and that they were young and immature practitioners. I, of course, brushed that aside, and took occasion to remark (at *p. 227*) that it was not an answer to say that the statements contained in the supposititious affidavits were true; that the power of the court could not be invoked by the mere off-hand statements of individuals; that it acts only upon oaths and affirmations, for the falsity of which in any material respect the deponent might be punished upon indictment and conviction for perjury. The respondents made

much of the fact that they were young lawyers, Breidt having been admitted a little less than three years and Lubetkin a little more than one year; but I held that that was a disingenuous excuse; that the courts had dealt with it and scouted it repeatedly, citing authorities.

Now, Mr. Styron has not even the excuse of youth and inexperience. He had been a member of this bar for thirty-four years and had been engaged extensively as a practitioner. The excuse he puts forth for signing and certifying the two supposititious acknowledgments, to which he wrote the name of the alleged assignor, without his authority or knowledge, is that he did not think it necessary to get the signature of Clarence E. Smiley (who at least held the naked legal title to the mortgage), because Clarence's father, Dr. Smiley, told him to sign his son's name, and that he, Styron, thought it was all right upon the theory that if he, Dr. Smiley, owned the mortgage, and had it in the name of his son, he, the doctor, could direct him, Styron, to sign Clarence E. Smiley's name to those assignments. He further says that he thought that certifying to the acknowledgment as being Clarence E. Smiley's act and deed was a rather foolish thing to do but he did it just the same; that it was a transaction between friends; but, he also said, there was no justifying the acknowledgment feature that he could see. Comment from me on this state of facts is unnecessary. A bare statement of them is sufficient to brand Mr. Styron, I regret to say, with a gross piece of malpractice, unexcused and unexcusable. I could not write the opinion *In re Breidt and Lubetkin* and fail to write this one.

*In re Simon Hahn, 85 N. J. Eq. 510,* the court of errors and appeals decided that the court of chancery lacked the power to discipline a solicitor, dissociated from proceeding against him for contempt of court. This is not a proceeding against Mr. Styron for contempt. I incline to the opinion, however, that his conduct amounts to contempt of court. Whether so or not, it is unnecessary for me to charge him with, and compel him to answer for, contempt, as his admis-

sions before me on oath in the pending case, not only justify but imperatively call for the action I am about to take. Unlike the case of Breidt and Dubetkin the offence here before me was not perpetrated in the prosecution of a suit, although it was done during the pendency of one. It was an act of conveyancing at common law, the object being to secure a loan of money to the asserted owner on his mortgage which happened to be in the process of foreclosure. The supposititious assignments were not projected into the foreclosure suit in any way. Repayment was made before the final decree was entered.

Although the supreme court only has the power to discipline a solicitor (except in proceedings for contempt), the chancellor, who appoints at his pleasure the masters of the court of chancery, has the power to discipline them; and there are numerous instances of his having removed them at pleasure. During Chancellor McGill's administration a master certified that a certain married woman had made a separate acknowledgment before him to a mortgage which she signed together with her husband. It came out in proof that while the wife had signed the mortgage she did not acknowledge it, and that the husband had taken it to the master stating that he and his wife had signed it and requested him to sign the acknowledgment, which he complacently did. The chancellor revoked and canceled his master's commission. Chancellor Pitney revoked and canceled the commissions of several masters in chancery who had been disbarred as attorneys and solicitors, and I have done the same thing. And I feel obliged to do it now. I cannot permit a master in chancery who signed the name of the owner of the legal title to a mortgage to an assignment of that mortgage without the knowledge and authority of the owner, even if his father, who was a friend of the master, assured him that he, the father, was the owner and his son had no interest in it, and who, the master, deliberately certified over his signature that the alleged assignor personally appeared before him, that he was satisfied that he was the grantor in the instrument named,

and having made known to him the contents thereof, that he, the alleged assignor, acknowledged that he signed, sealed and delivered the same as his voluntary act and deed, when each certified fact was untrue—longer to continue in commission as a master of this court. Quite aside from the seriousness of the master's offence, I cannot refrain from observing that there was at least a possibility that if Mr. Styron had consulted the son as to the ownership of the mortgage that stood in his name, he might have asserted ownership himself, which would have made his, Styron's conduct, much more legally impossible. In fact, Mr. Styron said in his examination before me that while at the time he supposed Edwin R. Smiley owned the mortgage he has since learned that it was owned by Clarence E. Smiley. This demonstrates the absolute recklessness of Mr. Styron's act, aside from its illegality.

Before a master in chancery or other officer so empowered may take an acknowledgment to a deed of conveyance or other instrument, he must be satisfied that the party making the acknowledgment is the identical grantor named in the instrument; he cannot be so satisfied unless the grantor is known to him; he need not be well known, only casually known; but in one way or another he must be known—that is, the officer taking the acknowledgment must be satisfied in his conscience that the party making it is the identical person named in and who executed the instrument. See *In re H. C., Jr., 81 N. J. Eq. 8.*

All that I said (*In re Breidt and Lubetkin,* at *p. 226*) to to the effect that there is no way in law whereby an officer authorized to take an oath may certify that he has done such an act when in fact he has not; and that in the nature of things there can be no absent administration of an oath or the administration of an absent oath; that the thing is perfectly incongruous and impossible; that the administration of an oath means something or nothing; that it cannot be distorted; that there is no room for construction, and for a violation of the law in this regard there can be no excuse, applies with even greater force in this case.

Let an order be entered requiring Mr. Styron to forthwith surrender to this court his commission as master in chancery, to the end that it may be vacated and canceled.