Albert A.F. McGee, Esquire, solicitor of record in the matter of Mary Rhodes, alleged to be a lunatic, on March 17th, 1927, filed a petition herein charging the respondents with contempt of the power, authority and dignity of the court of chancery in willfully violating and contemning the process of the court and the due administration of justice. Upon this petition an order was made requiring the respondents to show cause before the chancellor, on March 29th, 1927, why they should not be adjudged guilty of contempt in the premises and punished accordingly. The only respondents who were not served with certified copies of the *Page 317 
petition, affidavits and order, and who did not voluntarily appear, were John F.X. Ries and Mrs. Wahl. On the return of the order only Ulysses G. Styron and Mrs. Franz appeared, and she stated that her name was Anna May Franz. They both pleaded not guilty. Mr. Styron filed an answer. The case was adjourned, by sundry adjournments, to May 31st, 1927, for hearing, whereupon Mary Woods and Eddie Thomas, two of the respondents, appeared and pleaded guilty, and witnesses were examined. At the conclusion of the hearing the case was adjourned to June 10th, when argument was had for the prosecution and respondent Ulysses G. Styron. Mrs. Franz made no argument in person or by counsel, whereupon the cause was adjourned to June 11th, 1927, when Irene L. Ries, one of the respondents, with her counsel, W. Holt Apgar, Esquire, attended and pleaded guilty, and the cause was adjourned until July 12th, 1927, and she was given leave in the meantime to put in a signed or sworn statement of facts concerning her participation in the matters, on oath or otherwise, but did not do so. The cause was then adjourned until this 13th of September, 1927.
The case was this: On March 12th, 1924, a proceeding was instituted in this court to have Mary Rhodes declared of unsound mind. John F.X. Ries and Ulysses G. Styron appeared as counsel in defense of Mary Rhodes, and all pleadings and other papers for the defense were filed in their joint names as solicitors of record, which was irregular. See In re Stewart, 85 N.J. Eq. 3;State v. Merra, 99 N.J. Eq. 480. They both were, however, her legal representatives in the case. They acted not only as solicitors, but as counsel. After trial, the jury found a verdict of sanity. Afterwards, Mary Rhodes retained Clarence L. Cole, Esquire, as solicitor and counsel to get back for her from Ries certain property which she had theretofore conveyed to him. The bill was filed May 1st, 1925. Ulysses G. Styron was solicitor and counsel for Ries in this suit, which resulted in a decree being made on June 22d 1926, that Ries account to Mary Rhodes and turn her property over to her, upon certain conditions. An appeal to the court *Page 318 
of errors and appeals was subsequently dismissed. On November 9th, 1926, another petition was presented to this court, praying for a commission to determine the soundness of mind of Mary Rhodes. Such commission was issued and thereafter Mr. Styron appeared as solicitor of record for Mary Rhodes, and both he and Ries acted as counsel. At the hearing the jury disagreed. Then, on December 14th, 1926, an alias commission was issued, and the venire was directed by the court to be issued to a master instead of to the sheriff (In re Mary Rhodes, 100 N.J. Eq. 370), to summon twenty-one jurors, who were summoned, and, at the trial, unanimously agreed upon a verdict that Mary Rhodes was of unsound mind and did not enjoy lucid intervals, so that she was not capable of governing herself, her lands and tenements, goods and chattels, and that she had been in the same state of lunacy since December 15th, 1923.
When the jury disagreed in the second lunacy case and the trial thereby became abortive, it necessarily became apparent to the defense and its representatives that further proceedings would be taken and that another jury might agree; and thereupon, Mrs. Rhodes, the subject of the inquisition, was removed from her home by Ries and secreted, so that she could not be served with notice of the execution of any lunacy commission, in the apparent belief that that was absolutely necessary in all circumstances, and in the hope that that would frustrate them. It did not. Rule 235 of this court requires that ten days' notice of the taking of an inquisition shall be given to the subject thereof, unless the court, for good reason, allow a shorter notice or dispense with notice altogether. There can be no doubt but that the court, in the peculiar circumstances of this case and the disappearance of Mrs. Rhodes, would have dispensed with such notice, had that fact been brought to its notice. The court controls its own rules, and rule 4 provides that the rules shall be considered general for the government of the court and the conduct of causes, and as their design is to facilitate business and advance justice, they may be relaxed or dispensed with by the court in any case where it shall be manifest *Page 319 
that a strict adherence to them would work surprise or injustice. In Lindsley's Case, 46 N.J. Eq. 358, Mrs. Lindsley was not served personally with a notice of the taking of the inquisition. Such a notice was left with her brother, and one was served upon Henry S. Harris, Esquire, a lawyer who had appeared in behalf of Mrs. Lindsley at the several previous inquisitions and in all proceedings concerning them. In that case, different from this, Mr. Harris afterwards appeared for Mrs. Lindsley at the inquisition, cross-examined witnesses produced by the petitioner, and produced witnesses himself. It was there held by Chancellor McGill (at p. 360) that it was not intimated that Mrs. Lindsley did not receive notice or that she did not have ample time to prepare for hearing, and that the objection was rested wholly on the fact that it had not been affirmatively shown that notice had reached Mrs. Lindsley; that under the circumstances the failure to show that notice was not received or that prejudice had for that reason been suffered, were fatal to the objection. Now, of course, the opinion was written with reference to the facts of that case, which differ from this. Besides, an inquisition of lunacy is a proceeding for the benefit of the community and of the unfortunate herself. The fact is that Mr. Styron was served with a notice of the taking of this alias inquisition. He had appeared for the subject, Mrs. Rhodes, in this very case on the taking of the inquisition at the original hearing, and this, as stated, was on an alias in the same cause, and it would seem that notice to her solicitor, who had not withdrawn his appearance on the record, would be sufficient, at least when it was not shown that the subject had suffered any injury. I take it that when a solicitor appears on the record for a client in a cause he is that solicitor until he is formally discharged by the client himself, or himself withdraws of record in the clerk's office, on due notice to his client. This Mr. Styron did not do. The court of errors and appeals has gone so far as to provide by rule that service upon a solicitor of record for the adversary party in the court below, shall be deemed good service until the respondent has given notice that he has employed another, *Page 320 
naming him in such notice, or until a new appearance entered by the new attorney or solicitor. See rule 2 of the court of errors and appeals. Now, I hold that Mr. Styron was attorney for Mrs. Rhodes on the alias commission, in the circumstances of this case, and that as there is nothing to show that she was harmed by lack of personal service upon her the inquisition and decree thereon are valid. This may be dictum, as the validity of the decree in lunacy is not involved, but it is pertinent as against Mr. Styron in this proceeding. An attorney seeking to withdraw must make an application to the court, for the relation does not terminate formally until there is a withdrawal of record, at least so far as the opposite party is concerned, the relation otherwise continues until the end of the litigation. 6C.J. 674.
The petition proceeds upon the theory that John F.X. Ries and Ulysses G. Styron, both solicitors of this court, conspired to defraud and take from Mrs. Rhodes all of her property. Ries, as stated, was not served, and so far as Mr. Styron is concerned, it is not necessary to consider and adjudge whether or not he was a party generally, or to all, to that fraud undoubtedly perpetrated by Ries upon Mrs. Rhodes. Incidentally, that matter will be hereafter mentioned, but as Mr. Styron is charged with being a party to the specific act of taking Mrs. Rhodes surreptitiously out of the State of New Jersey, to Wilmington, Delaware, and there and here participating in a transaction whereby Mrs. Woods was, for a consideration, to be induced to drop the lunacy proceeding above mentioned, I will treat alone that subject with reference to the contempt of this court. The facts were these:
Mr. Ries, having been engaged in endeavoring to defeat all of the litigations brought against Mrs. Rhodes and that brought by her against himself, said to Mr. Styron that he, Ries, was almost ready to collapse and wanted him, Styron, to go with him and certain other parties to Wilmington, Delaware, as Styron had been with him through all the litigations, saying he, Ries, was about at the end of his rope and wanted Styron to go as a friend. This is what Mr. Styron says. He also states that Ries said to him on the occasion, *Page 321 
that he thought he could get those people (meaning Mrs. Rhodes, mother, and Mrs. Woods, daughter) together, and have a family reconciliation and reunion. Margaret McGilley, one of the witnesses, said that about the middle of December, 1926, at Margate, where she saw Mr. Styron present with others, Ries said he was going to take Mrs. Woods out of the state to have a settlement with her, and said he was going to give her $25,000, and he thought she would be doing all right when she got that. Mrs. Woods, who was also sworn, said that about December 10th, 1926, Mrs. Franz called at her home and said she had a proposition that would make her a rich woman; she said Ries wanted her to drop the lunacy proceedings and would give her $25,000; after some hesitation she said she would accept; then she, Mrs. Franz, telephoned, and Ries, Mrs. Ries and Mrs. Wahl came in, and Ries told her again about the proposition and said the attorneys had to drop the case if she told them to do so. She said she was afraid to go into the thing and might go to jail, whereupon Mr. Ries said she could not go to jail, it was her own mother and she had a right to the money (which was to come out of her mother's estate), and said they could do nothing to her. Mrs. Franz told her she was a foolish woman if she did not take up with this proposition, and she remarked, "all right."
Between six and seven o'clock, Mr. Ries came with Mr. Styron, and Ries said they would have to go out of the jurisdiction of the court, would go to Wilmington. Mrs. Woods would not go unless Mr. Thomas went along. Mrs. Woods drove down to Margate in Mrs. Wahl's machine with Mrs. Franz, Eddie Thomas and her boy. When they got there Ries objected to Mr. Thomas going, and she replied that they were taking Mr. Sweeney and he was supposed to be going for her mother's protection, so Thomas went along. The party left for Wilmington about nine or nine-thirty o'clock at night. Mr. Ries drove one car. In it, besides himself, were Mrs. Rhodes, Mrs. McGilley, Mrs. Ries, Mr. Styron, Daniel Sweeney. In the other car were Mrs. Woods, her son, Eddie Thomas, Mrs. Franz and Mrs. Wahl. They all drove *Page 322 
to the Dupont Hotel, Wilmington, where they arrived about one or two o'clock that night, or, rather, in the morning. Mrs. McGilley shared the room with Mrs. Rhodes, who seemed confused the whole night and wanted to go home. In the afternoon Mr. Ries came in with some papers. Mrs. Rhodes signed by making her mark, and Mrs. McGilley signed too, presumably as a witness, although she does not say so. They left for home about half-past six o'clock the next evening, and stopped in Philadelphia. In the afternoon, and while at the Dupont Hotel, Wilmington, Mrs. Woods was called up to a room where Styron and Ries were. She went. There were present Mrs. Franz, Mrs. Wahl, Ries, Styron, Thomas and Mrs. Woods. Styron said: "You know what we are here for." And Ries then took up the conversation and said they were going to give her $25,000 in mortgages and in an equity of redemption. And after some haggling Mrs. Woods said: "Well, all right." Then Ries and Styron left and returned with a notary public, and brought papers for Mrs. Woods, which had already been signed by her mother, Mrs. Rhodes; they were the transfer of a mortgage and a conveyance of the equity of redemption in a house; and Mrs. Woods also signed a paper to stop the lunacy proceedings against her mother. The papers, except the stop-notice, were to be put in the keeping of Mrs. Franz, who then signed a paper acknowledging their receipt. That was all that was transacted, and from there the party went first to Philadelphia, and Mr. Ries and Mrs. Franz and Mrs. Woods went into a Mr. McClain's and left the papers in his care, because it was too late to place them in the safe deposit vault. They then went back to Atlantic City. The papers left were the same that were signed in Wilmington, except the notice to stop the suit. The mortgage assignment was by Mrs. Rhodes and the conveyance of the equity of redemption was from Mr. Ries, as owner of the property. It all really belonged to Mrs. Rhodes. Mrs. Woods, shortly thereafter, visited Mr. McGee, served him with the stop-notice, and told him to drop the suit. Mrs. Franz went with her. This was futile and has been so decided. In re Rhodes, supra. *Page 323 
Mrs. Woods says nothing about any proposed family reconciliation being contemplated, but only the proposed settlement of the lunacy proceeding for $25,000 was the object of the trip, and she also says her mother was eighty-six years old, and stated she never saw her mother at Wilmington except when they were taking her out to the auto to take her back home. There was no reconciliation and none was attempted. It is conjured up as a mere excuse to try to disguise the real purpose of the trip.
Mr. Styron was sworn in his own behalf. He said he had been a member of the bar since 1885, which, if he is guilty, is more to his discredit than his credit. Even if he were just admitted to the bar, this thing, if true, was indefensible. He says his first connection with the case was about March, 1924, before the first lunacy; that he was connected with Ries in defending Mrs. Rhodes, the alleged lunatic, and that he really conducted the cause. His next connection with the matter was when Mrs. Rhodes filed a bill against Ries. He filed the answer for the defendant Ries, and tried the cause. Next, in November, 1926, when the second lunacy case took place, he assisted on the part of the alleged lunatic and was himself solicitor of record. There was a jury of twelve men summoned, nine of whom agreed upon a verdict that Mrs. Rhodes was of unsound mind, but three refused to agree and did not sign the return. This provoked the issuance of an alias commission, and the summoning of twenty-one jurors in an endeavor to secure a verdict. It was to avoid service of notice upon Mrs. Rhodes that Ries removed and secreted her. He, Styron, as already remarked, was served with notice of the execution of this commission, and informed the server that he did not represent Mrs. Rhodes, although he was her solicitor of record in the case. He said the very thing he would be expected to say if he were cognizant of the movements of Ries himself, whose friend he was, and for whom he acted as counsel. He says he went to Mrs. McGilley's to afford Mrs. Rhodes an opportunity to get other counsel and found that Mrs. McGilley had been served too; that his employment ceased with the termination of the second lunacy *Page 324 
proceeding, which is not the law. He then went to the commissioners and told them that he would not appear.
About December 10th, 1926, he received a phone message from Mrs. Ries that Mr. Ries wanted to see him; that he, Ries, was down opposite the high school. Mr. Styron went there and found him in an automobile. He says Ries told him he had just had a talk with Mrs. Woods and said she was anxious to discontinue the proceedings against her mother; that she was ashamed to go around the town and have people say that she was trying to put her in an asylum (which did not follow); said he thought he could get those people together. Whereupon Mr. Styron says he asked how he proposed to do it, and Ries replied that he had made up his mind to take her and her friends and go away over night and have a family reconciliation or reunion. Mr. Styron says he then asked him why he proposed to go away, why not do it where he was, and Ries replied that he wanted to get away from scenes of bitterness that had been enacted around there, and he thought he would have a better chance, and he said that he, Styron, must go with him, that he was almost "all in" and ready to collapse; that Styron had been with him through all these litigations, and that he, Ries, was about at the end of his rope and wanted him by as a friend. Mr. Styron states that although he thought it a foolish thing, he said all right. They went down to Mrs. Franz's house in Margate, and the parties were there, or soon arrived, and they left in two cars and went down to Wilmington, where they arrived somewhere about two o'clock in the morning; that there was nothing said by him or in his hearing about getting Mrs. Rhodes out of the jurisdiction of the court to accomplish anything, nor anything said about any settlement involving money; that settlement was not mentioned. In Wilmington, in the afternoon, Styron says there was a meeting in his room. The room occupied by him and Ries. He says there was no preconcerted meeting; nothing happened so far as he knew or saw; he did not go out with Ries and get a notary public. Asked if there was a notary public there, he said he did not know, but a stranger came in with Mr. *Page 325 
Ries. Asked if he was in the room when Ries left and came back with a notary, he said he was not sure; was not paying much attention to those things; he saw no papers signed at all; he neither knew nor saw that Mrs. Rhodes signed any, never saw her sign a paper; was not told and did not know that Mrs. Woods was signing any papers; did not see papers put in an envelope and given to Mrs. Franz. They left Wilmington about six o'clock in the evening and drove to Philadelphia. He says he did not know what people got out of the car in Philadelphia or where they went. They then went on to Atlantic City to Mrs. McGilley's, where Mrs. Rhodes lived, she (not saying who) got out of the automobile at that place, and that is the last time he ever saw Mrs. Rhodes; he was at Ries' house at Atlantic City on one occasion, where he met Mr. Brooks, but cannot recollect when it was and does not recollect the son nor Betty McGilley being there; there was no occasion when he and Brooks and Mr. Ries went upstairs for the purpose of getting Mrs. Rhodes to sign papers. The evidence is not that he was in the room, but that he was downstairs. Mr. Styron says he never knew that Mrs. Rhodes was at Ries' house; that he never had any knowledge at any time of any removal of Mrs. Rhodes or attempt to remove her from the jurisdiction of the court; never had any talk with Ries about getting Mrs. Rhodes out of the jurisdiction; the first time he knew Mrs. Rhodes was not in Atlantic City was when he went down to Mrs. McGilley's to look for her for the purpose of informing her that the notice had been served upon him of the hearing before the commissioners. He, of course, saw her at Margate and at Wilmington, whither he knew she was going. Referring to Wilmington, Mr. Styron said that he never said any such thing as that the parties knew what they were there for; that he neither said nor heard Ries say that they had had two previous trials and had been unsuccessful, and that they would take care that they would be unsuccessful in the rest. He never said that he would be a poor man if the case were lost; that he never had a particle of financial interest in it; that he was paid for the two prior litigations but in the *Page 326 
latter one he was not. Mr. Styron says that he was familiar with the order appointing a receiver in the Rhodes Case and with its terms; that he never advised Ries not to turn over the securities to the receiver, and in the proceeding before the master never advised Ries not to account, but advised him that he would have to do so; he was before the master in Ries' behalf. At that time Mr. Styron says he believed that Ries had turned over the securities to Mrs. Rhodes; that he made two or three requests of the master at the time and informed him that he thought Mr. Ries was honestly endeavoring to get his account up; that nothing was spoken in his presence which would lead him to believe that any act was contemplated which would contemn the authority of the court or violate any order. Mr. Styron said that he did not see any reconciliation effected on the trip to Wilmington; he did not see Mrs. Rhodes from the time they got there until they left; that the mother and daughter went into separate rooms; never saw Mr. Ries make any attempt at reconciliation. Asked if he himself made any attempt, he replied: "I was not there for that purpose," without saying what purpose he was there for. The court finds no difficulty in saying what he was there for. He saw no such attempt made. He says that he did not know what was the object of the people who, as he says, just "drifted" into the room down in Wilmington. Again the court has no difficulty in knowing. He said that he was of opinion that, within the statute, Mrs. Rhodes was of sound mind, but possibly never was capable of conducting very large concerns.
Opposed, and contrary, to these particular denials there is too much testimony to be ignored. This trip to Wilmington was certainly a singular affair. It was conceived in ignorance and carried out in desperation. It was Ries' pet scheme; but I am not satisfied that Mr. Styron was so thoroughly convinced that settlement was just as futile in Delaware as in New Jersey, as he says and would have us believe. Although Mr. Styron has been a member of the bar since 1885, he, some time ago, excused, or rather attempted to excuse, before this court the signing by himself of the name of another *Page 327 
to a conveyance, and his own signature to the attestation clause and certified in the acknowledgment that it was duly executed by a man, whom, he admits, he never saw, by saying that as a third party informed him that he owned the security, therefore "it was all right." See Smiley v. Hanna, 94 N.J. Eq. 573. Of course, it was all wrong, and was palpable malpractice.
It may be, too, that he thought this Wilmington trip all right. He says that he thought that if his going would make Ries happy he would go with him, although it was at some personal discomfort and inconvenience to himself because he was a sick man at that time. He would have the court believe that he was summoned hastily over the telephone to meet a man on the street, some distance away, when he could just as well have gone to Styron's office — and, doubtless, would have gone there if he were willing to be seen — and asked Styron to go with him and a party to Wilmington, Delaware, a distance of over thirty miles, at night and in the dead of winter, when he was sick, simply as a friend, the object of the visit being to reconcile a mother and daughter who had had litigation over the mother's property, she being aged and infirm and alleged to be of unsound mind, is beyond belief; besides, the testimony of Mr. Styron himself is that the mother and daughter went in separate cars; that they occupied separate rooms; that they never came together; that there was no attempt made at reconciliation; and he does not say he expressed any wonderment that no reconciliation was even attempted, when he went along for no other purpose than to help as a friend of Ries, so he says. The whole thing is too silly for words. The real object, which was known to everyone present, was to induce the daughter to drop the lunacy litigation against her mother in which she was trying to protect the mother's property from the rapacity of Ries, and for which perfidy she was to be paid a consideration of $25,000, which was to come out of the mother's estate. It is true that Ries is not before the court. He was not served within the state, or elsewhere for that matter, with copies of the petition, affidavits and order to show *Page 328 
cause. He is, I am informed, indicted in Atlantic county for offense with reference to the litigation we are considering, and that he is a fugitive from justice. I have no hesitation in pronouncing him a very great scoundrel. Mr. Styron was in camp with him. He leaned upon Styron. He got him to defend the first and second lunacy proceedings, in the latter of which Mr. Styron appeared as a solicitor of record. When the jury in the second case failed to agree, it, of course, became apparent that further proceedings would be taken in the lunacy case, and, besides, his appeal on the accounting suit had been dismissed by the court of errors and appeals, and all this rather staggered Mr. Ries, and he hit upon the plan of bribing Mrs. Woods to drop the lunacy proceedings, and arranged the party for Wilmington in the vain hope and belief that he could consummate the agreement there, being out of the State of New Jersey, it would not be a contempt of court. Vain, inglorious hope. I cannot for one moment believe that Mr. Styron was not cognizant of the real purpose of this visit to Wilmington. He alone of all the witnesses varnishes a tale to exculpate himself. The other parties who are witnesses tell quite a different story. Mrs. Ries, wife of the respondent John F.X. Ries, who has appeared and pleaded guilty, was neither examined as a witness nor has she made any statement, on oath or otherwise, for which she was given leave, which might in any way exculpate or extenuate herself or Mr. Styron. In Wilmington, where the papers were to be signed by Mrs. Woods, her mother not having signed in her presence, was not even invited to be in the room with her daughter. There were present, besides Mr. Styron, Mrs. Franz, Mrs. Wahl, Mr. Ries, Mr. Thomas, Mrs. Woods and her boy. Mr. Styron says he does not know what, if anything, was transacted there. Mrs. Woods said that he remarked: "You know what we are here for." He denies this. Mr. Thomas says that in the Wilmington room Mr. Styron said: "Well, we all know what we are here for." Of the remaining parties present, the only one examined was Mrs. Franz, who, like Mr. Styron, pleaded not guilty, and was examined in her own behalf, representing *Page 329 
herself. She said she never offered $25,000 to Mrs. Woods to settle the litigation, that Mr. Ries did that; that she knew nothing about it; she says she went to Wilmington as a friend of Mrs. Woods, but didn't know what was going to be done. Asked if she was in the habit of taking thirty or fortymile trips in an automobile at night just to please a friend, she answered that was what she did it for, just as a friend. She went to Mr. McGee's office with Mrs. Woods when she served the notice on him to discontinue the lunacy proceedings, just as a friend. She refused to give her name to Mr. McGee because "we" had a business in Margate and she did not want it advertised. Absurd. She said the securities were put in a certain trust company in Mr. Ries' name and hers, and she had a key to the safe deposit box, which she quite complacently turned over to the court, and it was handed to the receiver, Judge Shinn, who was present. The papers were given to Mrs. Franz in Wilmington by Mr. Ries, who told her to hold them until he put them in the trust company. She saw them signed in a room where Mr. Ries and Mr. Styron were. She says she did not hear Mr. Styron say anything, and she said nothing. She says she went to Wilmington as a friend of Mrs. Woods, afterwards went to counsel's office with Mrs. Woods as a friend, and accepted the key as a friend of everybody. She says she knew nothing about any court order or receivership; nothing about the papers in the envelope which were handed to her. She did not recollect saying to Mrs. Woods that all would have to stick together. She disclaimed writing certain letters, said Mrs. Ries wrote them; that Mrs. Ries signed and mailed them.
From the above it will be seen that Mr. Styron is the only one of the party sworn who denies having said in the room that they knew what they were there for, except Mrs. Franz, who is a co-respondent and who only negatively denied any knowledge of guilt and simply said she heard Styron say nothing; she did not say that he did not make the remark. On this issue Mr. Styron is overcome two to one, with Mrs. Franz affording him no real corroboration. Of course, the numerical superiority of witnesses does not settle the question *Page 330 
of the weight of evidence. State v. Karpowitz,98 N.J. Law 546. It is, however, pertinent upon the issue, and may be considered with all the facts. Besides, as stated, Mrs. Franz is a co-respondent, and has a decided interest in denying everything. She, however, adds her statement of the fact that papers were signed in the room in Wilmington, and she saw them so signed; that they were put in an envelope and there handed to her. Mr. Styron must have seen this signing, being there, yet he denies it. He was there by his own say-so, and others' say-so also. Mrs. Woods heard him make the remark, "You know what we are here for." The papers signed by her mother were brought in and Mrs. Woods there executed papers in his presence. Eddie Thomas said that Styron remarked, "Well, we all know what we are here for." And then Ries took the conversation over. There were some papers brought in, but he, Thomas, did not see any signing, he went out in the hall and walked up and down. So he corroborates the fact that the papers were there and they must have been signed, and the signing by Mrs. Woods seen by Mr. Styron. These are all the people who were examined, and again Mr. Styron is overweighted in the evidence, two to one. That is not all: Mrs. Woods testified that after the papers were signed in Wilmington, Mr. Styron looked them over and made a remark in a low tone to Mr. Ries, which witness did not hear, and Ries replied: "Yes, that is all right."
Mr. Styron made the remark that he would be a poor man if the case were lost. He says he never said it. The McGilleys say that he remarked that if he lost the case he would be a poor man. Again, two to one.
Mr. Styron said that neither he nor Ries said that they had had two previous trials and had been unsuccessful and they would take care that they would be unsuccessful in the rest. Let us see about this: Betty McGilley said that Mr. Styron remarked that the worst thing they could get would be a disagreement. They had lots of friends on the jury. Mrs. Woods said that Mr. Styron remarked that they had had two trials and been unsuccessful and they would take care that the others would be the same way. Eddie Thomas said *Page 331 
that in the room in Delaware someone (he could not recollect who) said that Mrs. Woods had had two former trials and they would see that they would still be unsuccessful. Here again are two witnesses to one, with strong corroboration of the two by a third. If Mr. Styron made the remark, and I find that he did, then the person whom Thomas heard was Styron. So, here are really three witnesss against him.
Of course this, standing by itself, is unimportant. A party is always at liberty to predict the result of a trial, and litigants, and their counsel, are prone to say, though perhaps they should not, that they have friends on the jury, c. But, in this case, it was a fact testified to, denied by Mr. Styron, who is clearly overweighted by the testimony. It helps to make up the legitimate atmosphere of the case. It goes to show Mr. Styron's interest in it, and his very great desire that it should be successful. It will be remembered that Mr. Styron said he had no financial interest whatever in the cause. On the argument, counsel for Mr. Styron laid much stress upon the fact that there were contradictions or additions or omissions between facts stated in Mrs. Woods' deposition in this matter and her testimony in court. These things she explained by stating her forgetfulness to state certain facts at certain times; that her memory had been refreshed, c. This is quite frequently the case; and there is nothing in this that would call for rejection of her story or even the discrediting of it. She is far too strongly corroborated to warrant anything like that. Moreover, there was, as usual, some variance in the testimony of some of the other witnesses as to certain facts, some hearing things that others did not hear and some seeing things that others did not see. It is a well known rule that where all of the statements of all of the witnesses agree in every particular, it is some evidence that the story has been preconcerted among them and is untrue in whole or in part; but where, as here, the stories differ in the particulars I have mentioned, but agree generally on the whole matter, they bear inherent proof of their honesty, and what I said of the testimony of Mrs. Woods is true of them. There *Page 332 
is nothing in what the witnesses have said, or omitted to say, which calls either for rejection of their stories or discrediting them; they are all far too strongly corroborated to warrant anything of that kind.
Now, it will be remembered that the trip to Wilmington was undertaken for the purpose of inducing Mrs. Woods to settle and dismiss the lunacy proceeding for a consideration of $25,000. Mrs. Woods says so. Mrs. McGilley says she went down to Margate about the middle of December, 1926, with Mrs. Rhodes, Daniel Sweeney and Mrs. Ries, and that Mr. Styron was there at Mrs. Franz's. Mrs. Woods was there, too. Ries said he was going to take Mrs. Woods out of the state to have a settlement with her and said he was going to give her $25,000, and thought she would be doing all right when she got that. Daniel Sweeney says that he was at the interview in Margate and that Ries told him he was going to have a settlement with Mrs. Woods, she was tired of court business, and somebody said in the presence of Ries, Styron and Mrs. Franz that settlement had to be out of the state, and that they were going to Wilmington. Eddie Thomas was not present at many of the interviews, but went to Wilmington with the party and testifies to what Styron said there, and, inferentially, that papers were signed in his presence. This was clearly a corroboration of the story that Mr. Styron knew what the party went to Wilmington for. Even Mrs. Franz, co-respondent of Styron in this case, says that Mr. Styron was in the room in Wilmington and she saw papers signed there. This again corroborates the story.
The condition of the old lady at and before the time she was taken to Wilmington must be apparent. It will, however, be pertinent to inquire exactly what her condition was. The best description of it is found in the testimony of Mrs. McGilley's daughter, Betty. She says that one morning, about six-thirty o'clock, Mrs. Ries came to their house and asked her mother to get Mrs. Rhodes ready as quickly as possible. Mrs. Ries dressed Mrs. Rhodes; there was a taxi waiting and they all went to Ries' home. He was there. Betty stayed there until about seven o'clock P.M., put Mrs. Rhodes *Page 333 
to bed and then went home with her mother. She went down and stayed all the next day. Mr. Styron came in that night. The house was pitch dark. Mrs. Rhodes said: "Let's go home, Bess." Ries said: "Oh, no, * * * you will go home in a few days." Betty was there three nights. When Styron came he stayed in the kitchen talking with Ries, but they said nothing in the presence of the witness. The next night they took her away. Ries said: "We cannot take her out the front, we are going to take her over the fence." While she was at Ries' darkened house she signed papers in bed; Styron was in the kitchen at the time. I pass that over. I simply say that Mrs. Rhodes was smuggled down to Ries' house, there detained (as if in jail), and forcibly taken in her old age, decrepit condition and mental deficiency, to Wilmington, where she signed with her cross-conveyance of a mortgage for something in the neighborhood of $20,000 to her daughter, Mrs. Woods, which was afterwards taken down to the room in which Mr. Styron was and handed to him, together with a conveyance of the equity of redemption in a property which Ries had gotten Mrs. Rhodes to convey to him, as a consideration for her, Mrs. Woods, signing a paper to discontinue the prosecution of her lunacy suit and directing her solicitor and counsel to dismiss it. Besides the illegality involved in all this, it was simply shameful. All of the property of Mrs. Rhodes conveyed to Ries was ordered to be reassigned, reconveyed and returned to her by Ries. See Rhodes
v. Ries, 99 N.J. Eq. 638. The opinion ends with the assertion that upon the payment of the amount, if any, due Ries, the conveyances will be set aside. This was afterwards done by final decree in the accounting suit filed in the clerk's office, June 27th, 1927. This was after Mrs. Rhodes' death. See Shinn,Admr., v. Ries, 169 (docket 58).
Daniel Sweeney was a friend of old Mrs. Rhodes, and went with her when she retained Judge Cole. This was in the suit of Rhodes against Ries to get back the property. After the decree on the hearing, which was filed in the clerk's office June 22d 1926, Judge Cole was sought to be discharged by Mrs. Rhodes. She signed a paper called an acknowledgment. *Page 334 Rhodes v. Ries, 58-169. It recites that, saving the rights of Cole Cole, formerly solicitors, to the extent of fees, costs,c. (which apparently had not been paid), it acknowledgedsatisfaction and stated that the lien was extinguished bysettlement of October 27th, 1926, upon the surrender and acceptance of the property mentioned in the decree with which she was fully satisfied, and thereby fully released the defendant John F.X. Ries. This was signed by the ancient and infirm Mary Rhodes, now found to be a lunatic without lucid intervals, covering that period, by a cross, and witnessed by Margaret McGilley. No name of solicitor appears endorsed upon the "acknowledgment," though it was filed and Mr. Styron's name appears thereon, apparently done on the filing in the chancery clerk's office. That Ries had not redelivered to her the securities is perfectly apparent. Later in the same year, in Wilmington, he conveyed an equity of redemption to Mrs. Woods, having obtained the property from Mrs. Rhodes. That this alleged "settlement" was engineered by Ries is palpable. Mr. Styron was not only his counsel, but his friend, and it is quite impossible to believe that he was not cognizant of what was doing. It is perhaps unimportant, but clearly indicates the atmosphere of fraud that permeated the case from start to finish. The only date on the "acknowledgment" is the filing, November 13th, 1926. Yet there is a final decree in the receivership suit filed June 27th, 1927, over seven months afterwards, which recites that Ries had failed to file an account as provided in the decree of June 22d 1926, had expressly denied that that was any compensation due him for services rendered to Mrs. Rhodes, and that the complainant, Judge Shinn, administrator of Mrs. Rhodes, was entitled to have set aside the several deeds, mortgages, assignments of mortgages and other writings set forth in the bill, and it was decreed that Mary Rhodes died seized of the lands and tenements mentioned in the bill, and possessed and owned the mortgages and assignments of mortgages and securities therein referred to, and it was further decreed that Ries be required to convey, transfer, assign and set over to Judge Shinn, administrator, c., all such property, *Page 335 
real and personal. It may be remarked that the only kind ofreconveyance that Ries ever made to Mrs Rhodes was apparently the kind described by Betty McGilley, which took place one night at their house. Mr. Ries and his wife came in and then Mr. Styron came, or was there, whereupon Mr. Ries said to Mrs. Rhodes: "Here you are, mother, here is your papers back that I am supposed to spend on you." Mr. Ries put the papers on the table. It could not be seen if they were papers, because they were wrapped up in brown paper. She says Mrs. Rhodes took them up, laid them back again, and Mr. Ries took them away. There was an occasion when Ries went up to Mrs. Rhodes' room in his house, with others, just before they went to Wilmington, and aroused her from sleep and got her to sign some papers. Mr. Styron was in the house but did not go up to the room with them. I mention this to show that I have not forgotten it. I pass it over.
As to Mr. Styron's conduct as counsel for Ries before the special master on the accounting in Rhodes v. Ries, I fail to see that on that occasion Mr. Styron can be accused of conduct which was contemptuous. The case before the master was peculiar in the character of procedure adopted, apparently by consent of everybody. I pass that over as unimportant to the result of the inquiry concerning the Wilmington trip.
The last act of this wretched business was the taking of old Mrs. Rhodes from her jail-like abode in Ries', in Atlantic City, to Ocean View, near Norfolk, Virginia, where she went in an automobile. Ries took her. Mrs. Woods and others were in it. Mr. Styron, be it said, was not. Ries rented a house there and gave the name of the occupants as Jones. They got there March 9th, and Mrs. Rhodes died nine days after, March 18th, 1927. The undertaker then telephoned to Mr. Styron, to know if his bill would be all right, and he gave him proper assurances. This closed the chapter, and is unimportant in and of itself, at least as against Mr. Styron. I pass this over too.
The situation, in a narrow compass, was this: Mrs. Rhodes, an ancient, infirm and mentally deficient woman, was very *Page 336 
properly made the subject of litigation by her daughter, Mrs. Woods, to establish her lunacy, so that her property might be saved to her in her lifetime and to her family after her death. She fell into the hands of Mr. Ries, as attorney and solicitor, who scarcely knew her before, and he persuaded her to enter into a contract to give him one-half of her estate, amounting to about $55,000, to defend her in the lunacy proceeding. This was one of the most unconscionable things of the kind ever perpetrated. It was so easily done that he concluded, apparently, to dispoil her of all her property, and succeeded in getting her to make conveyances, c., to him, accomplishing that result. She afterwards, perhaps appreciating in some degree the injury done to her, commenced the suit of Rhodes v. Ries, 58-169, to recover that property, and it was adjudged therein that Ries reconvey. He expressly disclaimed that she owed him anything for services, so there was nothing that the property had to stand as security for. Her daughter had very commendably commenced a lunacy proceeding against her mother in March, 1924. The hearing was had in April, and the return of the jury was that Mrs. Rhodes was of sound mind. I refrain from comment. The bill to set aside the conveyances was filed April 28th, 1925. On November 9th, 1926, Mrs. Woods filed a second petition in lunacy against her mother. In December the cause was heard and the jury, twelve in number, disagreed, nine for a verdict of insanity and three refused to so find and sign the return. An alias commission was issued, a date fixed for hearing thereunder, and the commissioners were directed by this court to issue a precept to a master to summon twenty-one jurors (In re Rhodes, supra), so twelve would be apt to agree to a finding and sign the verdict. On December 21st, 1926, an order was made reciting that Mary Woods, in a signed communication to Albert A.F. McGee, Esquire, her solicitor of record, and Moore Butler, Esquires, her counsel, instructed and required them to dismiss the petition filed in the lunacy case and discontinue all proceedings thereunder, because Mrs. Woods had decided to withdraw the petition and cease the further prosecution *Page 337 
thereof; but the chancellor, being of opinion that a commission of lunacy is begun, and a proceeding thereunder is had, in the interest of the public and is for the benefit of the person alleged to be of unsound mind, and it appearing from the affidavit of Mary Woods, annexed to the petition for a commission, that she herself swore that Mary Rhodes, her mother, the subject of the inquisition, was so far deprived of her reason and understanding that she was rendered altogether unfit and unable to govern herself or to manage her estate, that Mary Rhodes, being a ward of the court of chancery and the chancellor being the general guardian of all lunatics in the state, therefore, for the better and proper protection of Mary Rhodes, it was ordered that the solicitor and counsel for the petitioner be, and they were thereby, authorized and directed to proceed with the prosecution of the above matter in the name of Mary Woods as petitioner, notwithstanding her direction to them to discontinue and cease the further prosecution thereof, and that such proceedings should be prosecuted with all convenient speed.
Up to this time, and after the agreement with Mrs. Woods had been signed and delivered, and she had directed her solicitor and counsel to discontinue the cause, it was not discovered, so far as the court believes, that these proceedings were taken in behalf of the public and for the benefit of the subject. This was not horn-book law, but rather occult. No opinion upon it had ever been delivered in the courts of this state until the above order was entered December 16th, 1927, and the opinion itself was not filed until February 16th, 1927. At the time that Mrs. Woods signed the paper in form discharging the solicitor and counsel, and ordering them to discontinue proceedings in the suit, it was undoubtedly believed by those accused in this case that these proceedings, like others, were under the control of the complainant or petitioner, and could be discontinued and stopped by him. It was not until the industry of counsel, urged by the tactics adopted by the defense, brought the matter to the attention of the court, which provoked an investigation of the law, and the order and opinion mentioned. I have not *Page 338 
the slightest doubt that Ries knew nothing whatever concerning this law of the case, nor do I think that Styron knew it either. And certainly the lay people concerned knew nothing of it. Nor was it to the interest of solicitor and counsel in the camp of Ries to enlighten them. But, whether so or not, they anyhow, and of course, had the hope and expectation that Mrs. Woods' counsel and solicitor would drop the proceedings on her order, and that there the matter would end.
Now, the trip to Wilmington was taken for the purpose of ousting the court of its jurisdiction to further proceed and protect this old lady. She was a ward of this court, as the chancellor is general guardian of all lunatics, and when they are brought before the court the jurisdiction parens patrioe
obtains, and they are wards of court. In re Mary Rhodes, allegedto be a lunatic, supra.
The proceeding instituted for the purpose of stopping the lunacy suit, staying the hand of this court and thus obstructing justice, was, of course, a contempt. Counsel for Mr. Styron frankly stated on the argument that this case was purely one of fact and that there was little or no law involved.
Neither ignorance of the law nor disclaimer of intention or design to embarrass the due administration of justice is any excuse for the commission of contempt, and the counsel is just as liable as a party for its pains and penalties. An agreement to discontinue these lunacy proceedings was arrived at in or about Atlantic City by Ries with Mrs. Woods, the petitioner, the object was to prevent a declaration of insanity against Mrs. Rhodes, and thereby further prevent a guardian being appointed for her to move against Ries; in other words, to assist him in his design of keeping for himself the property of Mrs. Rhodes, which he had illegally gotten. Mr. Styron was his friend and counsel, and says so himself. Mr. Styron, in my judgment, was cognizant of all that went on. The circumstances of this case point indubitably to the fact that he knew about this arrangement; that the proposition was to give Mrs. Woods $25,000 out of her mother's *Page 339 
estate for her to stop the prosecution of her cause and thereby, perhaps, enable Ries to keep the balance of the estate. Styron was the counsel, and, therefore, in the pay of Ries. If Ries owned this estate he could pay Styron handsomely. If it was wrested from him, he could pay him little and would perhaps pay him nothing beyond what he had paid him. He, Styron, therefore, had every reason to assist in carrying out this project. It was fraudulent and illegal, and where there is a design to do an illegal act, followed by an overt act in pursuance of that design, the conspiracy is complete. State v. Reiners,80 N.J. Law 196. Even if Mr. Styron was not in the conspiracy up to the time he went down to Margate and joined the party on their ride to Wilmington, he joined it then, certainly in the sense that he knew of and participated in the design, and the law is, that if an individual connect himself with a conspiracy it is not a defense to say that the whole plot was concocted before he became an associate. By joining the parties and aiding in the execution, he adopts their prior acts and declarations. Stewart v.Johnson, 18 N.J. Law 87. See, also, State v. Gregory,93 N.J. Law 205, 210. If an attorney advises or participates in an act which will be contempt of court he is himself guilty with his client. In re Cooley, 95 N.J. Eq. 485, 490. In this conspiracy were Mr. and Mrs. Ries, Mr. Styron, Mrs. Woods and Mrs. Franz, and at least technically, Eddie Thomas. Mr. Ries and Mrs. Wahl were never served nor appeared before the court, and no judgment can be pronounced against them.
Now, as I have said, the conspiracy was concocted in Atlantic City. An overt act in furtherance of it was committed in Wilmington, Delaware, when the agreement was gotten from Mrs. Woods. Mr. Styron was there and cognizant of the purpose of the visit and its execution. And participated in it by remarks at the opening of the conference and by passing on the papers signed. Another overt act was when, to carry it out, Mrs. Woods went with Mrs. Franz to Mr. McGee's office and delivered the paper signed in Wilmington to discontinue the lunacy proceeding, and ordered the solicitor and counsel to do so. In Mulford v. Tunis,35 N.J. Law *Page 340 257, the supreme court (at p. 261) said that the rule of evidence that where several persons are engaged in the pursuit of a common object, the acts and declarations of one while engaged in the prosecution of the common purpose may be given in evidence against all, is so well established that citation of authority in its support can hardly be needed. This conspiracy was hatched in Atlantic City or thereabouts. It makes no difference that an overt act took place in Wilmington, if the thing were carried out in this state; and this was done, or sought to be, which in law is the same thing. An offense partly committed abroad is nevereheless within the jurisdiction of the local court. SeeKing v. Oliphant, L.R. (1905), 2 K.B. 67. See, also,Rex v. Brisac, 4 East 164, 171.
The power of the courts to punish for contempt extends to all persons who injuriously interfere with the proper exercise of their judicial functions, whether such persons be officers of such courts, parties or strangers. State v. Doty,32 N.J. Law 403.
The charge against all these respondents, besides that of conspiracy generally, is a specific allegation that Ries, Styron, Mrs. Ries, Daniel Sweeney, Margaret McGilley, Betty McGilley, Mary Woods, daughter of Mrs. Rhodes, Mrs. Franz, Mrs. Wahl and Eddie Thomas, were in it generally and participated in the trip to Wilmington for the purpose of defrauding Mrs. Rhodes, and inducing Mary Woods to accept the sum of $25,000 out of her mother's estate, for the purpose of defrauding her and obstructing the due administration of justice, and that this was a contempt of this court. As already stated, Ries and Mrs. Wahl were never served and are not before the court. Neither is Mr. Sweeney, who was not made a respondent. Mrs. Ries subsequently appeared and pleaded guilty, as stated, and I find Mr. Styron and Mrs. Franz guilty also.
All are guilty. Mrs. Ries, Mrs. Woods and Mr. Thomas have pleaded guilty. Mr. Styron and Mrs. Franz, I find guilty.
This conspiracy affected the power, authority and dignity *Page 341 
of the court and is an offense against organized society itself.Staley v. South Jersey Realty Co., 83 N.J. Eq. 300. The persons at whom it is directed are entitled throughout to such of the substantial rights of persons accused of crime as are consistent with the summary nature of the proceeding and the processes of the forum in which it is administered. Staley Case,supra. And this guilt can only be found, if established beyond a reasonable doubt. All this was afforded to the defendants. Not only is the guilt of these defendants so established, but, in my judgment, on the proofs, there is no doubt whatever about it.
Counsel for the prosecution states that it is unpleasant to urge to the court that a lawyer of forty-two years' standing at the bar, like Mr. Styron, be held in contempt, and counsel for the latter adds that it also is a serious thing from the standpoint of the lawyer charged, and I concur in both these views, but, as judge of the court, in the performance of my duty, I am bound to follow where my conclusions lead, and they lead where the proof lies, and that is superabundant in this case. I have no alternative. The dereliction of Mr. Styron, a solicitor and counsel and officer of this court, is manifest, and he must be substantially punished as a warning to those who would, in like case, offend. I regret to say there are such.
Mrs. Franz stands before the court in very reprehensible attitude. She was the friend of Ries, the one who, apparently, first approached Mrs. Woods and solicited her acceptance of the bribe, for such it was. She, Mrs. Franz, denied it. She was made one of the depositories of the securities which were placed in the Franklin Trust Company in Ries' name and hers. She had guilty knowledge. When Mrs. Woods sought to retire from the scheme of settlement and dismission, she bolstered her up and told her not to back out. She denied everything, and is very free with her oath.
The sentence of the court is that Ulysses G. Styron pay a fine of $500; that Mrs. Anna May Franz pay a fine of $100; that Mrs. Irene L. Ries, while under the domination of her husband, presumably to a great extent, has pleaded guilty, *Page 342 
but has refused to take the stand, and has made no statement to the court nor given it any aid in any way. Her fine will be $100 also. Mrs. Woods did her duty in carrying on the litigation up to the time when, in a moment of weakness, she accepted the $25,000 bribe, and ceased to assist in saving her mother's estate. She seemed willing to take the $25,000 out of what might be left, rather than run the risk of her participation as heir-at-law after her mother's death, in which could be recovered from Ries. There is less excuse for her than for the others, she hoped to benefit financially, and her fine will be $150. Mr. Edward Thomas is a good-natured man, who advised Mrs. Woods not to go to Wilmington, but when she concluded to go, he went along. He has pleaded guilty and must take the consequences. His fine will be $50. All these fines are payable to the clerk in chancery for the use of the state, and, unless immediately paid, an appropriate warrant will issue.