This matter is of such importance to the court and the public in general — it is so unusual in its nature — that it cannot be passed over in silence, nor can it be passed upon except in such manner as will inform the public generally of the position which the court must of necessity take in matters of this kind.
I have prepared a statement, which I propose to make now, in connection with this affair. That statement was prepared in the hope that it will be sufficiently informative to the general public, and to these men, in particular, and as an admonition *Page 606 
to the bar of this county and the state, so that in the future an occurrence of this kind cannot well happen.
Except for the fact that this particular occurrence has resulted in a much more serious challenge of the authority of this court, and a much greater libel upon it, I would not, perhaps, have made my remarks so extensive to-day as I propose to do; but sometimes people who would not otherwise attack one of the state's institutions are moved to do so by encouragement which is given from previous attacks, and since this resolution which is the basis of this proceeding was adopted by the board of commissioners of the borough of Bradley Beach, another gentleman, in no way connected with this affair, has launched a most violent attack upon this court, which will undoubtedly be the subject of appropriate proceedings hereafter. With respect to that particular matter, I was not personally connected, but the fact that it did occur shows the iniquity of the proceedings here under review, and the necessity of the present proceeding, and in my judgment, the later libel perhaps would not have occurred, had not this been a forerunner of it.
This contempt proceeding arises in connection with a decision of this court in Sparks v. La Reine Hotel Corp., docket 76, page 135, and an order of this court pursuant thereto approving the final account of the receivers of the defendant corporation and directing the distribution of the funds in their hands, which order was advised by me on November 21st, 1932. The facts there involved are stated in my opinion filed in that cause disposing of the petition to vacate that order. 112 N.J. Eq. 398.
Of the parties charged with contempt of court, Joseph R. Megill is counsel for the borough of Bradley Beach and a solicitor of this court, and Frank C. Borden, Jr., Bernard V. Poland and John Rogers are the members of the board of commissioners of that borough. Bernard V. Poland is also a solicitor of this court.
The acts and conduct of the parties constituting the contempt so charged, with one exception, were acknowledged and *Page 607 
admitted by them in open court and their contempt may, therefore, be considered as committed in facie curiae. No petition, affidavits or formal order to show cause has been filed or entered in this proceeding, as, following the filing of the petition to vacate the order of distribution above referred to, the parties voluntarily appeared in open court, waived the usual formal proceedings and submitted themselves to the jurisdiction of the court, and their voluntary statements were taken and recorded. That such formalities may be waived see In reGlauberman, 107 N.J. Eq. 384; Dorrian v. Davis, 105 N.J. Eq. 147.
The circumstances giving rise to this proceeding, in addition to those stated in my opinion filed in the receivership matter, are as follows:
Notwithstanding the borough of Bradley Beach had received due notice of the filing of the receivers' final report and account in Sparks v. La Reine Hotel Corp., supra, and its default at the hearing thereon, the board of commissioners of that borough, on December 20th, 1932, and within the time in which an appeal from the order approving the receivers' account might have been taken, adopted a resolution reciting the disbursement by the receivers of the balance in their hands and the non-payment of the borough's tax claim, and calling upon the governor and the chancellor "to make an investigation of this case to determine whether or not the various charges allowed can be justified by the laws of this state and the procedure of the court of chancery." The resolution further stated "that if such practices are allowed by the court of chancery, we believe it is time for the governor or the chancellor to devise some means to protect the creditors of such insolvent corporations, especially when it relates to taxes which are to be used for governmental purposes." Under date of December 22d, a certified copy of this resolution was forwarded to the chancellor, who immediately referred the matter to me. The resolution was evidently prepared by counsel for the borough who filed its claim with the receivers and who filed the present petition, although this he denies. *Page 608 
If it was not so prepared, it was prepared by Commissioner Poland, a lawyer member of the commission, with the knowledge of such counsel and with his tacit approval and acquiescence. I believe, however, that both took part in its composition and that the ultimate result represented their combined efforts. But it is not necessary to make any definite finding on this point as there are other admitted facts sufficient for a finding of contempt. Not satisfied with the adoption of such a resolution and its certification to the chancellor, and in complete disregard of the orderly procedure prescribed by our Chancery act (1 Cum. Supp.Comp. Stat. p. 269 § 111), the matter was aired in the public press and a copy of the resolution, accompanied by reports of extensive interviews with the borough solicitor, the mayor and the other commissioners, was published in the Asbury ParkEvening Press of December 21st, 1932, under glaring headlines in which it was stated "Bradley Beach calls on Moore and Campbell to explain chancery court practice which cost town $2,015. Honest jury would not fear it, counsel says." The newspaper report quotes counsel for the borough as saying: "An honest vice-chancellor, who has nothing to fear, should welcome an investigation of his office, if only to give it a clean bill of health." (The "honest jury" in the headlines evidently was intended for "honest judge" and was inspired by counsel's alleged statement.) The impropriety of such action is immediately apparent. It can be attributed only to ignorance or to the prevalent hysteria resulting from economic conditions. That it is contemptuous goes without saying, and the inevitable tendency of a spirit thus displayed is to "sap the foundations of public and private confidence and to introduce in its stead universal distrust and distress." It lays the foundation for anarchy, or worse, for "where law ends, there tyranny begins," and shows marked disrespect for our institutions. The perpetrators of this calumny evidently overlooked the fact that this court is a part of one of the three co-ordinate branches of the state government. Under our constitution certain powers are inherent in this court and the legislature, *Page 609 
as representative of the people, has enlarged those powers, particularly with respect to matters pertaining to corporate insolvency. In the exercise of these powers, the judiciary "exercises neither force nor will, but only judgment." But so long as the judiciary is composed of human beings it will not be expected to be infallible in its judgment, any more than is any other branch of the government or any individual. It was because of this recognized fallibility, man's proneness to err, that the wise system of checks and balance was provided in our basic law by our forefathers. An effectual corrective check on judicial error is provided by appeal to the court of errors and appeals, the court of last resort in all causes, where an alleged error of one court or judge may be reviewed by a court composed of sixteen judges, whose judgment must be final. The requirements of good government demand that judicial error be corrected in the orderly manner prescribed by law, rather than by venomous complaint and hue and cry in the public press. Our government is a government of laws, not of men; and, if orderly government survives, law must remain supreme. If the system itself is faulty it should be corrected in the manner provided by our constitution and laws, not by scolding or vilification. Nothing is gained by charge and counter-charge, or by investigation and report, except that enmities are engendered and confidence in our institutions destroyed; "the shallowest understanding and the rudest hands" may destroy what the most brilliant minds and the most skillful hands have labored to build, and if confidence in the judicial branch of the government is destroyed we must inevitably return to trial by battle. The judiciary was declared by Alexander Hamilton, more than one hundred and fifty years ago, to be the "citadel of public justice and the public security." He also declared, agreeing with Montesquieu, that of the three branches, the executive, the legislative and the judicial, the judicial branch is the weakest and the least dangerous to the political rights of the people under the constitution; and, because of its inherent weakness, is entitled to the full and hearty support of the people against calumny and abuse. Hamilton further said: *Page 610 
"If then the courts of justice are to be considered as the bulwarks of a limited constitution, against legislative encroachments, this consideration will afford a strong argument for the permanent tenure of judicial offices, since nothing will contribute so much as this to that independent spirit in the judges, which must be essential to the faithful performance of so arduous a duty.
"This independence of the judges is equally requisite to guard the constitution and the rights of individuals, from the effects of those ill humours which the arts of designing men, or the influence of particular conjectures, sometimes disseminate among the people themselves, and which, though they speedily give place to better information, and more deliberate reflection, have a tendency, in the meantime, to occasion dangerous innovations in the government. * * *
"* * * The benefits of the integrity and moderation of the judiciary have already been felt in more states than one; and though they may have displeased those whose sinister expectations they may have disappointed, they must have commanded the esteem and applause of all the virtuous and disinterested. Considerate men, of every description, ought to prize whatever will tend to beget or fortify that temper in the courts; as no man can be sure that he may not be to-morrow the victim of a spirit of injustice, by which he may be a gainer to-day. And every man must now feel, that the inevitable tendency of such a spirit is to sap the foundations of public and private confidence, and to introduce in its stead universal distrust and distress." The Federalist, No. 78.
The spirit condemned by Hamilton is the spirit displayed by the parties at bar in their unwarranted public criticism of a decision of this court, which, if wrong, should be corrected by the method prescribed by law, and in an orderly and dispassionate manner. The late President Calvin Coolidge, when governor of Massachusetts, said: "Courts are established not to determine the popularity of a cause but to adjudicate and enforce rights." The New York Law Journal, in the issue of January 6th, 1932, commenting editorially upon this statement, said: "For the benefit of the general public, this stirring admonition might well be inscribed over the portals of every courthouse in the land." Vice-Chancellor Stein, speaking for this court, recently said: "In the past this court has not been swerved from its duty by any thought of public approval or disapproval" and "in the future will not be, for if it should be, anarchy in its true sense will be substituted for a government by law" (In re *Page 611 Stegman, 112 N.J. Eq. 72, 85), and so far as I am concerned, I prefer to be condemned for a right decision rather than applauded for a wrong one. And while I have nothing to fear from an honest investigation of my judicial acts, I cannot subscribe to the statement attributed to counsel for the petitioner that "an honest vice-chancellor, who has nothing to fear, should welcome an investigation of his office, if only to give it a clean bill of health." I would welcome such an investigation to about the same extent that counsel or the members of the board of commissioners of Bradley Beach would welcome an indictment for rape if he or they were innocent of the charge; and yet such an indictment would give them an opportunity to prove their innocence (which had not theretofore been questioned) and thus obtain for themselves the coveted "clean bill of health." The members of this court are all serving the public at a considerable financial sacrifice, a sacrifice which represents the price to them of the honor attached to the office; but these culprits, and others of their ilk, would steal from us the only heritage we may leave to posterity, since wealth and property are denied us.
 "Who steals my purse steals trash, * * * But he that filches from me my good name, Robs me of that which not enriches him, And makes me poor indeed."
The judiciary has been called the "bulwark of liberty" and it is frequently resorted to in defense of the liberties guaranteed by the constitution, and not without avail. Nor is it of itself defenseless, for it has an effective weapon for defense of its own honor in and by the process of contempt. This weapon it will not hesitate to use when and as occasion requires. Such an occasion is now presented. It is just as important to protect the judicial ermine from the soiling barbs of unwarranted criticism as from the sullying effects of the misconduct of him who wears it. It is not so surprising that the laymen members of the board of commissioners should engage in the popular pastime of criticising the court of *Page 612 
chancery without cause, but it is amazing that their counsel and the lawyer member of that board, both of whom are officers of this court, should join in that diversion. The acts of the laymen are contemptuous; that of the lawyers, worse. Joseph R. Megill, Frank C. Borden, Jr., Bernard V. Poland and John Rogers are hereby found guilty of contempt of this court. They will all be required to make honorable amends, and appropriate punishment or discipline will be imposed.
 * * * * * * *
On the return of the order to show cause issued upon the borough's petition to vacate, above referred to, the commissioners of the borough of Bradley Beach and their counsel appeared in open court and publicly apologized for their conduct in this matter, offered to make proper amends and asked for an opportunity to do so in as public a manner as characterized the previous proceedings. The matter was continued to February 9th, 1933, in order to afford them the opportunity requested. Since then, a resolution, of which the following is a copy, has been adopted by the board of commissioners, certified to the governor and the chancellor and published in the Asbury Park Press, and the matter will now be disposed of in the light of these circumstances: The resolution follows:
"Whereas, on Tuesday, December 20, 1932, a resolution was passed by the Board of Commissioners of the Borough of Bradley Beach, whereby reference was made to the failure of the Chancery Court to allow the payment of personal taxes in a receivership proceeding of the Hotel LaReine at Bradley Beach, New Jersey; and
"Whereas, said resolution contained the following clause:
"`Be is resolved by this Board that the Hon. A. Harry Moore, governor of New Jersey, and the Hon. Luther A. Campbell, Chancellor of New Jersey, be and hereby are requested to make an investigation of this case to determine whether or not the various charges allowed can be justified by laws of this state and the procedure of the court of chancery, and
"`Be it further resolved that if such practices are allowed by the court of chancery, we believe that it is time for the governor or the chancellor to devise some means to protect the creditors of such insolvent corporations, especially when it relates to taxes, which are to be used for governmental purposes' and *Page 613 
"Whereas, said resolution was copied in the press of this state and in the news articles referring thereto, other statements were referred to as having been made; and
"Whereas, the Commissioners of the Borough of Bradley Beach were not fully cognizant of the various steps of the Chancery proceedings in this matter and did not have full knowledge of the general facts pertaining to this receivership, at the time said resolution was passed; and
"Whereas, they now have the facts and circumstances surrounding the matter and feel that the resolution and newspaper articles concerning the same might be construed as casting a reflection upon the actions of the Chancery Court; and
"Whereas, the Hon. Maja Leon Berry presides in the Chancery Court over the district in which this receivership proceedings were had; therefore
"Be it Resolved, that the Board of Commissioners feel that, inadvertently and without intent, an injustice by inference has been done the Hon. Maja Leon Berry, and if that inference can be or has been in any way, drawn from our resolution, we desire to go on record as publicly apologizing to the Vice-Chancellor, the Hon. Maja Leon Berry; and
"Be it Further Resolved, that this public announcement is actuated by a keen desire to eliminate any thought or suggestion that we would in any way, either directly or indirectly, intentionally cast a reflection upon him or his office; and
"Be it Further Resolved, that we are prompted in making this public announcement in the thought that Vice-Chancellor Maja Leon Berry enjoys, in this and other communities, an unsullied reputation, both personally and judicially, and we exceedingly regret that any act of ours, by inference, or otherwise, should injure in any way that reputation; and
"Be it Further Resolved, that we feel, as do thousands of others among the bar and laymen of this state, that the Chancery Court of our state may well be proud in having on its bench a man of such high integrity, honesty and judicial ability, and these statements are conscientiously made, not solely for the purpose of formal announcement, but because we feel it our duty to lend every effort to correct a false impression concerning one of our judiciary who is justly entitled to all of the honor, confidence and distinction as a member of the bench that could possibly be bestowed upon him by his fellowmen; and
"Be is Further Resolved, that in view of the fact that the previous resolution was published in the press, and a copy sent to the Governor and Chancellor of our state, that copies of this resolution also be delivered to the Governor and Chancellor, and a copy be forwarded to the press for general publication."
Mr. Megill has also made a statement which was published in the same paper, and which is as follows: *Page 614 
"There appeared in your issue of Dec. 21, 1932, a news item concerning the non-payment of personal taxes due to the boro of Bradley Beach in connection with the receivership proceedings of the La Reine Hotel corporation, in which there appeared a statement attributed to me that might be construed as a reflection upon the honesty of Vice-Chancellor Berry.
"I did not make the statement attributed to me, nor was any other statement made by me which could be construed in any manner as a reflection upon Vice-Chancellor Berry.
"Vice-Chancellor Berry's reputation, both personally and as a jurist, is above reproach, and I certainly would not by word or action cast any aspersions upon him."
The power of the courts to punish for contempt extends to all persons who injuriously interfere with the proper exercise of their judicial function, whether such persons be officers of such courts, parties or strangers. In re Ries, 101 N.J. Eq. 315.
"And an attorney who advises or participates in an act which will be a contempt of court is himself guilty of such contempt."Ibid. The punishment which might be meted out to the parties at bar is largely in the discretion of the court. It may consist of a fine, imprisonment, or both, or even to the confiscation of the estate of the guilty person. But courts of justice always temper justice with mercy, and particularly is this so with respect to the court of chancery, which is essentially a court of conscience. In passing sentence for a contempt of court, the court does not seek revenge or enrichment at the expense of the offender; it merely acts to protect its own honor and dignity as a branch of government and to compel respect for its orders and decrees.
The action of the members of the board of commissioners, as such, by which they have attempted to right their own wrong, indicates a return to that normal mental attitude from which respect for government and its institutions follows as a matter of course. That the injury cannot be wholly repaired is obvious, for it is hardly likely that all who heard the original calumny can now be reached by the published apology. Slander has been called the "meanest spawn of hell," and its blot can never be wholly effaced. But in so far as the laymen members of the board are concerned, their *Page 615 
apology in open court in connection with their published resolution of apology, will be considered as a sufficient atonement of their wrong. And while no doubt some specific punishment, by way of fine or imprisonment, might be appropriately imposed upon them as an admonition to others to refrain from following their example, I prefer to err upon the side of mercy rather than to appear unduly severe, or vindictive, and sentence in this instance will be suspended. But let this experience be a lesson to you and a guide for your future conduct, for a second offense may not, and, in this court, will not, meet with the same judicial clemency.
As to Mr. Megill and Mr. Poland, who are officers of this court, and whose conduct is therefore the more reprehensible, it is deemed that, for their own good, and as an example to other officers of this court, some disciplinary measures should be adopted. While Mr. Megill denies having made the statement attributed to him by the press, the sworn testimony of the newspaper reporter who covered the meeting at which the statement is supposed to have been made is positive to the effect that the press report is entirely correct; and there is some corroboration of this testimony in the voluntary statements of both Megill and Poland. But whether he did or not, he permitted the public to accept the statement as his for a period of six weeks without publicly repudiating it, and it was only after called to the bar of this court that his long-delayed public denial was made. If the statement was not originally his he has adopted it as his own by his long silence and it is so considered. In his long-delayed public statement there is no word of apology, simply a continued denial of the statement previously attributed to him, and his remarks are directed more to me as an individual than to the court itself which is my greater concern. I have already said that the opinion which those at the bar may hold of me is of small moment, except as every individual cherishes the good opinion of his fellowmen, compared with their attitude of respect for the court in which I have the honor to preside. His statement indicates no spirit of contriteness over those matters *Page 616 
with which he was inseparably connected and which constitute the contempt of his fellows. Nor is there any regret expressed by him with respect to his conduct as an officer of this court. The same comment is applicable, in a limited degree, to Mr. Poland, the lawyer member of the board of commissioners. Upon their admission to the bar of this state they were commissioned as solicitors of this court and duly licensed to practice before it. But such licenses do not confer irrevocable privileges. Such privileges continue only during good behavior and may be revoked or suspended by the appropriate authority as occasion requires. The present circumstances are deemed sufficient cause for the suspension of the privilege heretofore accorded to these solicitors to practice in this court, and, as a disciplinary measure, an order will be forthwith entered suspending them from such privilege pending further action by the supreme court of this state, to which court the record of this proceeding will be certified, and which court alone has the ultimate power of effective discipline. In re Hahn, 85 N.J. Eq. 510.