Three matters were before the late Vice-Chancellor Backes and have been referred to me for determination: an application by the receiver of the Empire Floor and Wall Tile Company to punish for criminal contempt Passaic National Bank and Trust Company and certain of its officers and agents, together with the chief of police and corporation counsel of Metuchen, for interference with the receiver; to set aside a certain compromise agreement; and to charge the receiver with waste. These all arose in connection with a sale of personal property by the receiver at the plant which had been occupied by the Empire Tile Company.
Voluminous testimony was taken on all three matters.
In 1922 one John B. Owens, the owner, executed a mortgage on the premises in question to Passaic Trust and Safe Deposit Company, to whose rights Passaic National Bank and Trust Company succeeded. Owens leased the premises to the Empire Tile Company, which operated a tile factory. A large amount of various kinds of machinery, kilns, and other appliances for making tile were installed after the mortgage although it does not clearly appear whether these were paid for by the corporation or by Owens personally.
The bank instituted foreclosure proceedings in April, 1931, and the following month the receiver for the tile company was appointed. The foreclosure was contested, but finally resulted in a foreclosure sale on February 15th, 1933, and the premises were sold to the bank. During all this period the bank was mortgagee in possession and the receiver made no effort to remove from the premises any of the personal property which belonged to him. After the right to sell at foreclosure had been determined, and two or three months before the sale, the receiver notified the bank that the personal property on the premises belonged to him and suggested that this property be sold at the same time as the realty. The bank thereupon notified the receiver that it claimed the machinery and fixtures in the plant as subject to its mortgage. Conferences were had without agreement as to the respective rights. A correspondence then ensued between the respective counsel for the bank and the receiver. *Page 275 
On January 14th, 1933, the receiver's counsel wrote the bank's counsel, that "if you do not care to adjust the matter I will be obliged to apply to Vice-Chancellor Backes for an order restraining your sale, and a reference to a master in order to determine what the extent of your mortgage is, and your extent of ownership to the personal property." On January 25th, 1933, the bank notified the receiver that it claimed as part of the realty and would sell at the foreclosure sale certain specified items of machinery. In response on January 26th, the receiver's counsel wrote that part of the items were conceded but that certain others of them were claimed by the receiver, and that unless they could agree he was of the opinion that the matter should be submitted to the vice-chancellor.
The foreclosure sale was held on February 15th without any application having been made to the court to have the ownership of the disputed items determined. On February 21st, an order was made in the receivership proceeding directing a public sale of the personal property of the receiver on March 16th.
It is in connection with this sale that the acts charged as criminal contempt occurred. Counsel for the bank attended at the sale, and announced that purchasers would take subject to the rights of the bank, and then left. In the conditions of sale was the provision "Subject to the claim, if any, of the Passaic National Bank and Trust Company." The receiver through his auctioneers then proceeded to sell numerous items, including not only such articles as the bank conceded he owned, but also those in dispute. It was announced that application to confirm would be made on the 21st, and that purchasers could thereafter remove their goods. A report listing the items sold was presented to the court in the receivership proceeding, and the sale was confirmed. The bank was not a party to the receivership proceeding, although the receiver was a party to the foreclosure.
On March 22d 1933, when some of the purchasers came to take their goods, the watchman hired by the bank prevented the removal of any of the goods. He stated he was acting on orders from the bank and this was confirmed by *Page 276 
an officer of the bank to whom a representative of the receiver talked on the telephone. Considerable turmoil ensued and apparently there were threats of removal of the goods by force and of violent resistence on the other side. The watchman telephoned for the local police, who were followed by the chief of police and the corporation counsel of Metuchen.
After considerable argument, nothing was done and the receiver told the purchasers to come back the next day. Later in the day counsel for the receiver told the counsel for the bank that he would concede certain items to the bank so that the remainder could be delivered unhampered. It was arranged that an order should be presented to the court authorizing the settling of the respective claims. This order was entered the same day. Releases were prepared and executed but not until the 25th, whereby the bank admitted the right of the receiver to all the property listed in the receiver's petition of sale, except certain specified items which in general were the same as those mentioned in the previous letters of the bank. These items were released to the bank. The bank also released the receiver from claim for rent for the premises.
The releases were not executed until the 25th. In the meantime and on the 23d the scenes of the previous day were re-enacted, and the bank prevented the removal of any of the goods.
On the execution of the releases, purchasers were allowed to remove goods concededly belonging to the receiver.
This did not end the controversy, for when a purchaser attempted to remove certain electric power wiring and switch boxes for motors there was again a squabble over those items, which were not specifically listed in the petition for sale and therefore not expressly covered by the releases. The receiver obtained an order restraining the bank from interfering with further deliveries, and the wiring was removed.
It seems clear from the foregoing that there was an interference in fact with the rights of the receiver. For on the 22d and 23d days of March deliveries were prevented not only of items claimed by the bank but also of items which the bank both previously and subsequently admitted the receiver had the right to sell. The action of the watchman in refusing *Page 277 
any deliveries was authorized by the officers of the bank. The excuse is that the purchasers proposed to take away at the same time items which the bank claimed it owned by virtue of its foreclosure deed. Then, too, the bank claimed to be in possession of the plant and had given notice at the receiver's sale that it surrendered none of its rights. It is asserted on behalf of the bank that it considered replevin the proper remedy by the purchasers to secure possession. The bank had long previously suggested a settlement of items in dispute. The receiver himself had stated prior to the sale that he intended to bring the matter of ownership of disputed items before the court. This, of course, would have been an orderly and proper procedure, and when the sale took place without a determination of the rights to disputed items, it would then have been proper for the bank to have raised the matter by opposing confirmation of the sale, of which confirmation it had notice. But the bank took the attitude that since the goods were sold subject to its claim, even confirmation of the sale would not destroy its rights.
The reason asserted by the officers of the bank for not allowing anything to be removed on the 22d of March, is that it had not been served with the order confirming the sale, and therefore did not know what items were included in the confirmation.
From all these circumstances I cannot find an intention to commit a contempt, or that the bank acted in other than good faith, in the belief, however mistaken, that it was taking the proper measures to protect its rights. That it had rights and substantial ones, is shown by the execution of the release acknowledging its ownership of all the items which had been claimed by it in previous negotiations.
While it is true that criminal contempt must be proven by clear and convincing testimony (Larkin v. Local No. 560, c.,103 N.J. Eq. 195), it is not a defense to the charge that there was no criminal intent shown. It is sufficient if the act be one tending to obstruct the administration of justice and an unlawful interference with the subject-matter of litigation. In reSinger, 105 N.J. Eq. 220. *Page 278 
The fact remains that the bank, its respondent officers and agents interfered with the removal of goods to which it neither then or at any time made any claim. There was no warrant for this, but in view of the extenuating circumstances no penalty will be imposed.
As to the counsel for the bank I find no evidence that he directed or participated in the refusal to allow removal. After the refusal he and counsel for the receiver promptly arranged a settlement. I find him not guilty of contempt.
The subsequent disputes as to what was included in the releases do not, in my opinion, give any ground for contempt charges against any of the respondents.
As to the chief of police and the corporation counsel, I find that they are not guilty of a contempt since all they did was to see that there was no breach of the peace and to suggest an amicable settlement.
As to the application to abrogate the agreement of settlement in pursuance of which the releases were exchanged on March 25th, I find no ground for granting it. There is no proof that the bank violated the terms, but on the contrary, permitted the removal of all the items enumerated in the schedules referred to in the releases.
It is claimed on behalf of the bank that the receiver is chargeable with waste because of the illegal removal of certain power cable, and two certain motors, certain switch boxes, all asserted to be the property of the bank.
The two motors in question certainly belonged to the bank, being attached to two blowers and as such expressly released to the bank. The testimony is somewhat conflicting as to these motors, which were only two among many at the plant. The receiver says positively that he did not authorize their removal nor that of the switch boxes attached thereto. I shall not hold him responsible for them. There remains the matter of the electric cable. This was sold by the receiver for $120, its removal under the receiver's personal direction was resisted, and it was finally removed by the purchaser after the issuance of the order of restraint referred to above. Considerable damage was done to the building in breaking it away from the insulated hangers. This cable was not listed in the *Page 279 
schedules of items released by the bank to the receiver. This was because it was not listed in the schedule annexed to the petition of sale on which the releases were based. The cable was, however, sold at the auction and was included specifically in the report of sale which was filed with the court and accordingly was covered by the order confirming the sale. Its removal was therefore at least inferentially authorized by the order restraining the bank from interfering with deliveries of articles which had been sold. Under these circumstances I shall not find the receiver liable for waste. *Page 280