This is an application to punish for criminal contempt pursuant to Chancery rule 128 (d). The facts have been stipulated and on the day set for the hearing of the cause the defendant pleaded "not guilty."
The defendant is charged with having testified "falsely, deceptively and perjuriously" while under oath as a witness before Augustus C. Studer, Jr., one of the Masters of this court, to whom a reference was made in a cause therein pending for the purpose of supervising certain examinations and inspections by the complainant of books, records, documents, c., in the possession of the defendants in said cause; and for the purpose of taking the testimony of witnesses who should be subpoenaed to testify before said Master. The alleged false testimony is set forth in detail in the petition filed herein, but I deem it unnecessary to recite it here; suffice it to say that it constitutes the baldest and most flagrant piece of perjury that has ever come to my official notice in my more than a quarter of a century of service in the judiciary of this state. The testimony and its falsity were both admitted by the defendant at the hearing on the return of the order to show cause herein, both orally through the defendant's counsel and by the filing of the aforementioned stipulation, *Page 406 
and, without going into unnecessary detail, I may say that the false testimony was quite material to the issues in the cause in which it was given. It also involved the partial destruction and mutilation of documentary evidence in the cause.
The false testimony referred to in the petition filed herein was given on April 2d and May 2d 1946. It did not consist of an answer to a single question, but was made up of a series of deliberate falsehoods. On April 2d, the defendant was questioned about a $250 check of the Imperial Fur Blending Corporation, of which company he was secretary and treasurer. The check was drawn to his order and signed by him. The answers to at least a dozen of the questions concerning this check were admittedly false. At a later hearing before the Master on April 5th, 1946, the defendant admitted the falsity of this testimony. On May 2d, he was examined with reference to a check of the same company for $800, drawn to the order of M. Reiner Bro. and signed by the defendant. This examination, reproduced from the transcript of the stenographer's notes, occupies more than a dozen pages of the petition filed herein and is a tissue of lies. The answers to at least forty of the questions put to him during the course of the examination touching this $800 check were deliberate falsehoods. All of this false testimony was given in a patent attempt to deceive the court and to obstruct the course of justice.
That perjury or false swearing is a contempt of court and may be punished, notwithstanding an indictment for perjury as a crime will also lie, see Seastream v. New Jersey Exhibition Co.,69 N.J. Eq. 15; affirmed, 72 N.J. Eq. 377; Edwards v. Edwards,87 N.J. Eq. 546; Sachs v. High Clothing Co., 90 N.J. Eq. 545;Backer v. A.B. B. Realty Co., 107 N.J. Eq. 246; Zettler v.Zettler (unreported, Chancery Docket 95, p. 592); In reRosenberg, 90 Wisc. 581; 63 N.W. Rep. 1065; In re Steiner,195 Fed. Rep. 299; 12 Am. Jur. 400, tit. "Contempt," ¶ 17. Indeed, false swearing on which a charge of contempt is based, need not be sufficient to constitute perjury. 17 C.J.S. 32,tit. "Contempt," ¶ 24; Young v. State, 198 Ind. 629;154 N.E. Rep. 478; People *Page 407 
v. Freeman, 256 Ill. App. 233. And a party to an action is held to a stricter accountability for a contempt than a stranger.12 Am. Jur. 394 ¶ 7.
In 1 Chamberlyn's Modern Law of Evidence 304 § 249, the text is as follows:
"Of possible acts, few are so antagonistic to the objects of judicial administration as the intentional false swearing which seeks to baffle the search for truth, without which justice is impossible. Such swearing is a flagrant insult to the dignity of the court; and the same offense is committed by an attorney or other person who procures the giving of the perjured testimony. The nature of the subject-matter of the false evidence may affect, according to its importance or consequence, the action of the court in awarding punishment. False swearing as to the disposition of property stands in a different position from more important matters. But the offense, regardless of themateriality of the evidence given, may properly be dealt with as a contempt."
Pursuant to stipulation between counsel the complete file of the cause in which said false testimony was given, together with a complete transcript of all the testimony taken in said cause, was admitted in evidence at the hearing on this application, subject to defendant's objection of immateriality. They were admitted because in no other way could the issues of the main cause be adequately shown, and the relation of the false testimony to those issues, and its materiality, be sufficiently demonstrated. Berkson v. People, 154 Ill. 81;39 N.E. Rep. 1079.
Notwithstanding defendant's admission of the charge of giving false testimony, and of the mutilation and attempted concealment of documentary evidence as set forth in the petition filed herein, he has, as already stated, entered a plea of "not guilty." His defense to the charge is more or less technical and may be epitomized under the following heads:
1. Recantation, as a result of which there was no obstruction of justice.
2. Contempt, if any, was not in facie curiae, and therefore not cognizable before me as Vice-Chancellor.
3. Lack of jurisdiction.
I shall consider these defenses in the order above stated. Italics are mine throughout. *Page 408 
 1. RECANTATION, AND NON-OBSTRUCTION OF JUSTICE.
The argument in support of this defense is that the defendant, before the case in which he testified was closed, admitted that he had testified falsely, and then told the truth; and that as a result of his recantation or retraction the court was not deceived and there was no obstruction of justice, therefore no contempt. In support of this proposition counsel for defendant cites People v. Gillette, 126 App. Div. 665; 111 N.Y.S. 133;United States v. Turk (D.C., N.Y.), 10 F. Supp. 957; Inre Michael, 66 Sup. Ct. Rep. 78; 28 U.S.C.A. 385; In re Gottman
(C.C.A., N.Y., 1941), 118 Fed. Rep. 2d 425; and a few other cases from other jurisdictions on the subject of recantation; and In re Jibb, 123 N.J. Eq. 251; Backer v. A.B. B. Realty Co., supra; Sachs v. High Clothing Co., supra; Inre Ries, 101 N.J. Eq. 315; Ivens v. Empire Floor and Wall TileCo., 119 N.J. Eq. 273; In re Singer, 105 N.J. Eq. 220, and ExParte Hudgings, 249 U.S. 378, in support of the contention that perjury which does not actually obstruct justice is not contempt.
In the Gillette Case, it was held that false testimony if corrected by the witness before the termination of the proceedings in which it is given will not sustain an indictment for perjury. But this doctrine has since been repudiated by the United States Supreme Court in United States v. Norris,300 U.S. 564 (1936); 81 L.Ed. 808, where the Gillette Case and others looking the same way are criticised. In the Norris Case, Mr. Justice Roberts, speaking for the United States Supreme Court (at p. 810), said:
"The record in this case presents an important question of federal criminal law which has not been settled by our decisions. Does retraction neutralize false testimony previously given and exculpate the witness of perjury? * * *" (And at p. 813): "The respondent admitted he gave intentionally false testimony on September 22d. His recantation on the following day cannot alter this fact. He would have us hold that so long as the cause or proceeding in which false testimony is given is not closed there remains a locus poenitentiae of which he was entitled and did avail himself. The *Page 409 
implications and results of such a doctrine prove its unsoundness. Perjury is an obstruction of justice; its perpetration well may affect the dearest concerns of the parties before a tribunal. Deliberate material falsification under oath constitutes the crime of perjury and the crime is complete when a witness' statement has once been made. It is argued that to allow retraction of perjured testimony promotes the discovery of the truth and, if made before the proceeding is concluded, can do no harm to the parties. The argument overlooks the tendency of sucha view to encourage false swearing in the belief that if thefalsity be not discovered before the end of the hearing it willhave its intended effect but, if discovered, the witness maypurge himself of crime by resuming his role as witness andsubstituting the truth for his previous falsehood. It ignores the fact that the oath administered to the witness calls on him freely to disclose the truth in the first instance and not to put the court and the parties to the disadvantage, hindrance, and delay of ultimately extracting the truth by cross-examination, by extraneous investigation or other collateral means. * * * But it cannot be said that there is any respectable body of authority under the common law or statute in England or in the United States to support the respondent's position. * * *" (And at p.814): "The plain words of the statute and the public policy which called for its enactment alike demand we should hold that the telling of a deliberate lie by a witness completes the crime defined by the law. This is not to say that the correction of an innocent mistake, or the elaboration of an incomplete answer, may not demonstrate that there was no willful intent to swear falsely. We have here no such case."
People v. Gillette, supra, was expressly disapproved. That decision of the highest court of this country is a sufficient answer to the defense of recantation. See, also, People v.Freeman, supra, where it was held that a witness in a criminal prosecution, who, after answering a long line of questions on direct examination, subsequently on cross-examination declared such answers to be false, was guilty of contempt of court, as such testimony showed the utter disregard of the witness for the sanctity of his oath. *Page 410 
Counsel for the defendant in his reply brief argues that theNorris Case has no application here because it concerned an indictment for perjury. But so did the Gillette Case cited by him in support of his recantation theory.
But it is argued that the rule of the Gillette Case is an inducement to a witness to tell the truth and, in effect, that the defendant should be rewarded for his retraction by an acquittal of the charge here preferred against him. The argument is fallacious. In my judgment the application of the rule would encourage perjury, and this is the view of the United States Supreme Court, as expressed by Mr. Justice Roberts in the NorrisCase. The Gillette Case has also been disapproved in a later New York case, People v. Markan, 206 N.Y.S. 197. And there was nothing in the conduct of this defendant as a witness which calls for any reward. His recantation or retraction was not the result of contrition or repentance. It was not voluntary. It came only after a long period of relentless questioning by counsel and after the defendant witness had been driven into a corner, orcul de sac, from which there was no escape except by a confession of his iniquity. In one instance the false testimony was given on April 2d 1946. It was not corrected until April 5th, three days later, when his confession was literally torn from him. In the other case he testified on May 2d and recanted the same day under like circumstances. And still there is no sign of repentance. He admits having tried to deceive the court, but claims that because of his confession he has done no wrong. The perjury was the result of a studied plan of defense, thought out long in advance of the trial in which committed. This is apparent from the admitted mutilation of the $250 check months before the trial. And yet he offers no apology. He is still arrogant. A confession of sin without repentance merits no reward of forgiveness, nor is it a key to salvation.
The federal cases cited in support of the argument that where there is no obstruction of justice there is no contempt are not controlling. They all arose out of contempt proceedings in inferior federal courts, the creatures of statute, having no common law jurisdiction in matters of contempt, and the *Page 411 
decisions were controlled by statute. They need not be further considered here. None of the New Jersey cases cited is authority for the proposition advanced. They hold uniformly that any act or conduct which obstructs or tends to obstruct the course of justice constitutes a contempt of court. "The essence of contempt is that it obstructs or tends to obstruct the administration of justice." Fox, The History of Contempt of Court 216. And seeToledo Newspaper Co. v. United States, 247 U.S. 402. Of this case, in Fox's History of Contempt of Court (at p. 217), it is said:
"* * * the effect of the decision seems to be to enable the Courts to punish by summary process any contempt which obstructs or tends to obstruct the administration of justice."
In Oswald's "Contempt of Court" (at p. 6), it is said:
"Speaking generally, Contempt of Court may be said to be constituted by any conduct that tends to bring the authority and administration of the law into disrespect or disregard, or to interfere with, or prejudice parties litigant, or their witnesses during the litigation."
And (at p. 99):
"The distinction between contempts criminal and not criminal seems to be that contempts which tend to bring the administration of justice into scorn, or which tend to interfere with the due course of justice, are criminal in their nature; but that contempt in disregarding orders or judgments of a Civil Court is not criminal in its nature. In other words, where contempt involves a public injury or offence, it is criminal in its nature, and the proper remedy is committal — but where the contempt involves a private injury only it is not criminal in its nature, and the remedy is either attachment or committal * * *."
To the same effect is 12 Am. Jur. 389, tit. "Contempt,"
¶ 2, and 17 C.J.S. 33 ¶ 25. New Jersey cases holding that acts or conduct which tend to obstruct the course of justice, or which are merely attempts to obstruct, not actual obstruction of justice, constitute contempt of court are: In reBowers, 89 N.J. Eq. 307; Ivens v. Empire Floor and Wall TileCo., supra; In re Hand, 89 N.J. Eq. 469; In re Merrill, 88 N.J. Eq. 261; Sachs v. High Clothing Co., supra; In re Jenkinson,93 N.J. Eq. 545; In re Megill, 114 N.J. Eq. 604; In re Hendricks,113 N.J. Eq. 93; Backer v. *Page 412 A.B. B. Realty Co., supra; In re Singer, supra; Edwards v.Edwards, 87 N.J. Eq. 546; Seastream v. New Jersey ExhibitionCo., supra. See, also, In re Charlton 2 My. Cr. 317;40 Eng. Rep. 661; People v. Freeman, supra. In the Charlton Case
Chancellor Cottenham (p. 671), said: "All these authorities tend to the same point; they shew that it is immaterial what measures are adopted, if the object is to taint the source ofjustice, and to obtain a result of legal proceedings different from that which would follow in the ordinary course, it is a contempt of the highest order." In finding the defendant guilty of contempt in that case the Chancellor said his main offense was "his having attempted, by writing the letter, to influence
the conduct of the Master."
The first defense cannot prevail.
 2. CONTEMPT NOT IN FACIE CURIAE.
While the false swearing is admitted, it is contended that as the perjury was before a Master of the court and not before a Vice-Chancellor, or the Chancellor who is the court itself, the acts and conduct alleged to constitute contempt were not done or performed in the presence of the court. Counsel for the defendant cites Seastream v. New Jersey Exhibition Co., supra, and Inre Jibb, 123 N.J. Eq. 251, in support of this contention. He also cites R.S. 2:15-12, and argues that a Vice-Chancellor's authority in contempt matters is restricted by that act to contempts committed "in the presence of the court so held by the Vice-Chancellor."
In the Seastream Case, perjury by false affidavits was the offense held to constitute contempt. The matter originally came before Vice-Chancellor Pitney (67 N.J. Eq. 178). He referred the question of perjury to a judge of the Hudson County Court of Common Pleas (evidently as a Master in Chancery) for investigation and report. Upon the coming in of that report, the Vice-Chancellor issued an order to show cause why those who executed the false affidavits should not be adjudged guilty of contempt. When the matter came on for a hearing before him, he reached the conclusion that the respondents were guilty and certified his findings to the *Page 413 
Chancellor who reviewed all the evidence and came to the same conclusion. The Chancellor held that the reference to a Master was proper, and that "A proceeding for contempt not committed in open court, being punitive in character, and hence not the subject of appeal, and which may affect property and liberty, ought not to depend on the judgment of a Vice-Chancellor or Master in Chancery, but is a matter for the personal attention of the Chancellor." In considering this statement it must be borne in mind that the decision was made in 1906 or 1907, prior to the act of 1909 (P.L. 1909 p. 270), giving a right of appeal in criminal contempts (Staley v. South Jersey Realty Co., 83 N.J. Eq. 300,304) and prior to the promulgation of Chancery rule 128 (d) in 1919, which is a general reference of applications to punish for contempt, both civil and criminal, to Vice-Chancellors.
However, the Court of Errors and Appeals, speaking through Chief-Justice Gummere, "inclined to the view" that the Vice-Chancellor had the "power to hear and determine the subject-matter of the investigation" notwithstanding the absence of such a rule. This case is cited in a note to the text of 17C.J.S. 63 ¶ 49, as authority for the proposition that a Vice-Chancellor or Master in Chancery has no power to punish for contempt not committed in open court, but it is not. Whatever authoritative value it had at the date of the Chancellor's decision, was destroyed by the promulgation of Chancery rule 128 (d), if not entirely emasculated by the "view" of the Court of Errors and Appeals expressed in the opinion of that court affirming the Chancellor's decision. And the view that the filing of false affidavits and the like in a cause is not a contempt committed in open court (in facie curiae) is not in accord with later decisions of the Court of Chancery and the Court of Errors and Appeals. Backer v. A.B. B. Realty Co., supra; Sachs v.High Clothing Co., supra; In re Merrill, supra; In re Jenkinson,supra; In re Glauberman, 107 N.J. Eq. 384. And see, also, In reSchmidt, 88 N.J. Eq. 21, where the court (the Vice-Chancellor) was not even sitting.
It is true that in In re Jibb, supra, there are dicta to the effect that the filing of a false affidavit made outside the *Page 414 
presence of the court was not a contempt in facie curiae; but the point was not involved. The act was nevertheless characterized as "an offense against organized society," and "a criminal contempt." The decision appealed from was reversed solely because the contempt proceedings were not begun until more than two years after the offense was committed, and the reversal was based upon the statute of limitations, invoked by analogy. The decision does not support the contention of counsel for the defendant.
Chancery rule 93 authorizes references by Vice-Chancellors to Masters to take proofs. Rules 94 to 99 outline the procedure before Masters. It was pursuant to a reference thus authorized that Mr. Studer was acting when the defendant appeared before him and testified falsely. It is conceded that if the testimony had been given before me, as Vice-Chancellor, assuming it to have constituted a contempt of court, I could properly hear an application to hold defendant guilty of contempt — obviously because a Vice-Chancellor hears a cause for the Chancellor and is, pro hac vice, the court. And the same is true of a Master when he sits for the Chancellor notwithstanding the reference to him was by a Vice-Chancellor. The inherent power of the Chancellor to make references to the Vice-Chancellors is not questioned. But counsel argues that as the Chancellor is the Court of Chancery by express provision of the constitution, false swearing, misbehavior or other contemptuous conduct before a Master does not constitute contempt in facie curiae, although if committed in the presence of the Chancellor it would. It also seems to be conceded that a contempt committed before a Vice-Chancellor would be one in facie curiae, but only by virtue of the statute, R.S. 2:15-12. The argument is somewhat obscure and hard to follow, but if it is to the effect just stated, I wholly disagree with it.
In re Schwartz, 134 N.J. Law 267, cited by counsel for defendant, does not support his argument. The only question there involved was whether the defendant, who had been a witness before a grand jury, disobeyed or resisted "any lawful writ, process, order, rule, decree or command of the court." The court said that the contempt, if any, arose out *Page 415 
of subsection "C" of R.S. 2:15-1. The only writ, c., involved was the subpoena ad testificandum. The witness had obeyed that writ by his appearance as commanded. He did not misbehave or swear falsely while before the grand jury; his offense, if any, was in having refused to answer certain questions. As no order of court directing him to answer these questions had been issued, he was held not guilty of contempt within the meaning of the statute. The validity of the statute as a legislative restriction upon the inherent power of this court to punish for contempt was not involved. Chapter 37, P.L. 1917p. 71, referred to by Mr. Justice Colie, and which in theRevised Statutes is given as the source of R.S. 2:15-1, was declared unconstitutional in so far as it may be claimed to apply to the Court of Chancery in In re Bowers, supra. R.S. 2:15-12
is not a restrictive statute. The source of this statute is given as P.L. 1902 ch. 158 § 102, which is the Chancery Revision Act of 1902. It is essentially a Chancery Practice Act and in so far as it relates to the powers and duties of Vice-Chancellors, is largely declaratory of the previously existing law.
In his reply brief counsel for the defendant refers critically to Chancellor Walker's opinion, In re Vice-Chancellors, 105 N.J. Eq. 759,
in which the Chancellor held that Vice-Chancellors are constitutional officers. Inferentially, the soundness of the opinion is questioned. Obviously, the purpose of the reference is to minimize the status of Masters in Chancery and Vice-Chancellors. The extent of the intended criticism is not clear, but that these officers are no part of the court is plainly asserted. I cannot permit this assertion to go unchallenged and I shall attempt to demonstrate its falsity and the fallacy of counsel's argument. I have made some study of the history, jurisdiction and power of the Court of Chancery and it may not be amiss to record, in part, the result of my research.
In this opinion, the soundness of which counsel questions, Chancellor Walker based his conclusion that Vice-Chancellors are constitutional officers on the statement that they are "headmasters of the court" — "advisers of the Chancellor," traditional officers of the court appointed by the Chancellor *Page 416 
from time immemorial. Counsel argues, however, that Vice-Chancellors are creatures of statute, and inferentially, I think, that they have only such powers as are granted them by statute. With this argument I also disagree. The power of the Chancellor to make references to Masters is as old as the court itself. (See, generally, The Masters' Office, by W.H. Bennet), and the power to make references to his Vice-Chancellors who are but "headmasters," is of like antiquity. Although the appointment of Vice-Chancellors by the Chancellor in New Jersey is authorized by statute, so far as the power of appointment is concerned, the statute was but declaratory of a power which had resided in the Chancellor almost time out of mind.
In the sense that the Chancellor's power of appointment of Vice-Chancellors is of constitutional and not of statutory origin, and that this constitutional prerogative is not subject to impairment by legislative action, Chancellor Walker was entirely correct, and that that was what he meant when he said that Vice-Chancellors are constitutional officers seems plain from a careful reading of his opinion. While the office of Vice-Chancellor is nowhere mentioned in either the Constitution of 1776 or that of 1844, reference to those documents and a consideration of the history of our Court of Chancery make plain, I believe, that the power to appoint assistants of the Chancellor, be they Masters, Vice-Chancellors, or what not, resides in the Chancellor alone, who is the fountain-head of all their jurisdiction and power. Chancellor Walker held that Governor Franklin's ordinance of 1770 relating to the Court of Chancery still continues in full force and effect, and that that ordinance is the source of all the jurisdiction of the court and the powers and prerogatives of the Chancellor. In my judgment he might have traced this source to a much earlier date as that ordinance expressly recited that "there always hath been a Court of Chancery held in the province of New Jersey." SeePennsylvania Railroad Co. v. National Docks, c., Railway Co.,54 N.J. Eq. 647; Traudt v. Traudt, 116 N.J. Eq. 75; Lord Cornbury's Ordinance of 1705, 19 N.J. Eq. 578; Chancellor Zabriskie's account of the origin and jurisdiction of the Court of Chancery, *Page 417 19 N.J. Eq. 577, Appendix. A Court of Chancery, separate and distinct from the courts of law, existed in New Jersey as early as February, 1684. Miller, The Courts of Chancery of New Jersey,21, 57.
Governor Franklin's ordinance ordained that the Chancellor was "impowered to hold the said court, and in the same to hear and determine all causes, from time to time, and in such manner as heretofore hath been usual, and, as nearly as may be, according to the usage and custom of the High Court of Chancery in that part of Great Britain called England." That ordinance also provided that the Chancellor should appoint "so many masters, clerks, examiners, registers, and other necessary officers as shall be needful to the holding the said court, and doing the business therein." Neither our first nor present constitution contained any provision respecting the jurisdiction, powers or prerogatives of the Chancellor or the Court of Chancery. The first merely provided that the Governor should "be the chancellor of this colony" (article VIII). But it did provide that the common and statute law of England, except as repugnant to that charter, should remain in force (article XXII). The jurisdiction of the Court of Chancery and the prerogatives of the Chancellor were then defined by the common law of the mother country, and that jurisdiction and those prerogatives continued by virtue of this express provision. That charter also provided that the laws of the province lately compiled by Allinson (January 14th, 1776) should remain in force. In that compilation will be found Governor Belcher's ordinance of 1753 regulating and establishing fees of officers of the Court of Chancery and containing a comprehensive schedule of such fees. The provision touching Allinson's laws was an implied, if not an express, recognition of the Court of Chancery as it then existed under the ordinance of 1770. And the legislature, by act of October 7th, 1776 (Paterson's Laws (1800) 38), enacted that the several courts of law and equity should be confirmed, established and continued with like powers as they were held at and before the Declaration of Independence. Our present constitution (adopted in 1844) provides that "The Court of Chancery shall consist of the Chancellor" and that the *Page 418 
Chancellor shall be appointed by the Governor. Also that the several courts of law and equity except as therein otherwise provided, shall continue, with like powers and jurisdiction as if that constitution had not been adopted. Thus it is seen that by the Constitution of 1776 the organic law of the colony as it then stood was continued until the adoption of our present Constitution in 1844 which continued the Court of Chancery with like powers and jurisdiction as theretofore. We are, therefore, as Chancellor Walker said, referred to Governor Franklin's ordinance of 1770 for the power and jurisdiction of the court and the prerogatives of the Chancellor. By that ordinance we are in turn referred to the English common law and the "usage and custom of the High Court of Chancery" of England. The express authority to appoint Masters and other officers of the Court of Chancery, conferred upon the Chancellor by the ordinance of 1770, had been a prerogative of the English Chancellor from time immemorial.Bennet, The Master's Office, ch. 1; Robinson's EnglishInstitutions 727-31; Maddock's Principles and Practice of theCourt of Chancery 3; Hoffman's Masters in Chancery, Introduction; "A Treatise of the Masters of the Chauncerie,"Hargrave's Law Tracts 293; The Practice of the High Court ofChancery Unfolded (1652), 60 et seq.; Potter's HistoricalIntroduction to English Law 144, 509. And there is ample authority showing that the office of Vice-Chancellor existed in England many centuries before our separation from the mother country. Madox, The History and Antiquities of the Exchequer,c., 41-45, 53. Rembaldus, Chancellor to Edward the Confessor (1042-1066), had his Vice-Chancellor. Archeion, or A Discourseupon the High Courts of Justice in England, by William Lambard (1635), p. 50; and Lord Campbell names at least seventeen Vice-Chancellors who held office between 1189 and 1272, Lord Campbell's Lives of the Chancellors, 118 et seq. In Lord Chancellor Ellesmere's Observations Concerning the Office ofLord Chancellor (1651) 14, the text reads:
"* * * of Vice-Chancellors also I find two sorts, the one (as I take it) exercising the Office of a Chancellor in matters of Justice, and such a one was Malus Catalus in the time of Richard the First, *Page 419 
another which was chief Secretary as it seemed unto the Chancellor, to write the Patent of the Prince, and such a one wasSywardus, whose name I have seen subscribed to a Charter of Edward the Confessor."
See also note at the bottom of page 22 of Burroughs' Historyof the Chancery (1726).
Holdsworth in his History of English Law (vol. 1 p. 419), referring to the Master of the Rolls, says: "In the reign of Henry VIII, as at an earlier period, he is sometimes called vice-chancellor." And see, also, 1 Spence, The EquitableJurisdiction of the Court of Chancery 358, and 20 Ency. Brit.
(9th ed.) 628.
According to Lord Campbell the fashion of Chancellors having a Vice-Chancellor had passed away at the time of Wolsey (1515-1529); but Wolsey referred many cases to the Master of the Rolls, to common law judges and to Masters, and their functions were undoubtedly the same as those of Vice-Chancellors to-day.Bennet, The Masters' Office 1-24 and note, p. 3. That practice evidently began at a very early period (The Practice ofthe High Court of Chancery, c. (1672) 62, and Bennet, TheMasters' Office, ch. 1) and continued until 1813 when, by statute, the appointment of a Vice-Chancellor by the Crown was authorized. While in Wolsey's time the practice of appointing Vice-Chancellors had grown into disuse, I have no doubt that the Chancellor's ancient power of appointment existed at the time of our separation from the mother country. That this power was later vested in the Crown is immaterial as the limitations upon the jurisdiction and prerogatives of our Chancellor are to be determined as of the date of the separation. The jurisdiction of the Court of Chancery of New Jersey being co-extensive with that of the High Court of Chancery in England at the time of the adoption of our first constitution; the Chancellor being vested with like powers and prerogatives of the English Chancellor of that period; and express power to appoint "necessary officers" of the court having been conferred upon him by the ordinance of 1770, the constitutional power of the Chancellor to appoint Vice-Chancellors is not open to question. The legislature is powerless to deprive the *Page 420 
court of any of its inherent jurisdiction, or the Chancellor of any of his ancient prerogatives. Flanigan v. GuggenheimSmelting Co., 63 N.J. Law 647.
This constitutional prerogative of the Chancellor antedates the Norman Conquest and a recent example of its exercise by the Chancellor of New Jersey is the appointment of standing Advisory Masters to hear matrimonial causes. It is of little moment whether the Chancery judges functioning under the direction of the Chancellor are called Vice-Chancellors, Advisory Masters, "Headmasters," Special Masters, or what not. Their authority and jurisdiction have their source in the Chancellor, and not in legislative enactment. The Chancellor having the constitutional right of appointment of his Vice-Chancellors, they are, in this sense, constitutional officers.
The act of 1871 authorizing the appointment of a Vice-Chancellor by the Chancellor was but confirmatory of the power already existing. Its design beyond that was but to fix the term of office and the emoluments thereof and except for these limitations the term would have been indefinite and the compensation would have been dependent upon fees to be fixed by the Chancellor by rule of court.
The power and authority of the Chancellor to appoint standing Advisory Masters was expressly affirmed by our Court of Errors and Appeals in Traudt v. Traudt, supra. Twelve Advisory Masters were appointed by Chancellor Campbell in 1933 to hear matrimonial causes alone — others had been appointed previous to that time at the pleasure of the Chancellor. The statute, R.S.2:2-14, authorizing the appointment of Advisory Masters to hear matrimonial causes was not enacted until 1941. What was its purpose? Certainly not to confer a power which had been exercised by the Chancellors of this state time out of mind. So far as such power was concerned the statute was but declaratory; but like the statute authorizing the appointment of Vice-Chancellors, it fixed the terms of office and the emoluments thereof. This historical resume touching the Chancellor and his powers should be a sufficient answer to counsel's assertion that Masters in Chancery and Vice-Chancellors are no part of the Court of Chancery. *Page 421 
When, by authority of the Chancellor, Mr. Studer was named as Master to take the proofs during the course of which the defendant swore falsely, and when he sat to take such proofs, he was, as already suggested, for all practical purposes, the Chancellor and the court itself, except that his powers were limited by the terms of the order of reference. He was as much the Chancellor as I, or any other Vice-Chancellor to whom the cause might have been referred, would have been had any such one heard the testimony. He could not, of course, have summarily committed the defendant for his confessed perjury, but only because such action was outside the reference which limited his power and there was no general reference under which he could act. That power could, however, have been conferred upon him by the Chancellor. That was the course pursued in In re Bowers,supra. The reference there was to Merritt Lane, Esq., as Vice-Chancellor, but it could have been to him as Master and if so would have been of equal authority. See, also, Balk v.International Fur Workers' Union, 94 N.J. Eq. 780. In England a Master in lunacy may commit for contempt while executing an inquisition with a jury (Lunacy Act, 1890, § 99; 3 Ch. (1891)274-6), or without a jury (Lunacy Act 1891, § 29; 1 Ch.
(1892) 459). But we have a general reference to Vice-Chancellors by rule 128 (d).
As Mr. Studer, the Master, was pro hac vice the Chancellor — the Court of Chancery — whatever happened before him while sitting as such Master, was in open court and in facie curiae.
That by general rule the application to punish the defendant for his contempt now comes before me as a Vice-Chancellor does not alter the fact that his offense was committed in facie curiae.
But for a contempt to be in facie curiae it is not necessary that it be committed in the face of a judge of the court.
Contempts committed before Masters and others to whom judicial or quasi-judicial functions are delegated have always been properly cognizable and punishable by the court to which they were attached. Oswald Contempt of Court 16, and cases cited.
"In defining what is meant by `the presence of the Court,' *Page 422 
as that term is used with reference to contempts, it is said that `the Court' consists not of the judge, the courtroom, the jury, or the jury room individually, but all of these combined. The Court is present wherever any of its constituent parts is engaged in the prosecution of the business of the court according to law." 12 Am. Jur. 392, tit. "Contempt," ¶ 5. The term "in the presence of the court" has always been given a liberal interpretation. Fox's History of Contempt of Court 54. Any direct contempt is in facie curiae. In re Jenkinson, supra. The assault of a litigant on the way to court, but not actually in court, has been held to be a contempt in facie curiae, Fox 54;
"it is a great contempt to terrify a witness that is to be examined" (classified as a direct and positive contempt), ThePractical Register in Chancery (1714) 100; likewise an assault on a stranger who was supposed to be a witness, but was not, In re Hand, supra; a letter to the Ordinary abusing a judge of a probate court was held a contempt in facie curiae. Inre Merrill, supra; a threatening letter to the clerk in Chancery was held to be a contempt in facie curiae. In re Jenkinson,supra; likewise, a letter to a party litigant and threats to a solicitor, both outside the court. In re Bowers, supra. An act committed outside the presence of the court, but confessed or admitted in open court — as in the case of a scurrilous letter addressed to the court, the authorship being admitted in open court — constitutes a contempt in facie curiae. In re Megill,supra. I cite this decision by me only because counsel for the defendant, in his brief, says, "I find no other case that so holds." He may be referred to the following cases: John deNorthampton's Case, A.D. 1344, Mich. Term, 18 Edw. III; WilkinsCase, A.D. 1722, Easter Term, 8 Geo. I; Rex v. Middleton, A.D.1723, Easter Term, 9 Geo. I, Fortescue 201; Royson's Case, 1 Cro.Car. 146; Year Book, 7 Henry VI, 25; In re Charlton, 2 My. Cr.317; 40 Eng. Rep. 661; In re Merrill, supra; In re Jenkinson,supra; and see Styles' Practical Register (1657),tit. "Contempt." And see, also, Fox's History of Contempt of Court
(1927) 106-7, where the "Defoe" Case is referred to, a short account of which is as follows: *Page 423 
In 1713 Daniel Defoe was a defendant to an information charging him with a libel on the government in "Reasons against the Succession of the House of Hanover" and other pamphlets. Pending proceedings he wrote and published newspaper comments on them. On the trial of the information, the newspapers containing the comments were put in the defendant's hands and he admitted responsibility for them. Upon this confession he was committedforthwith. This summary procedure upon confession without any formal process, is said to be in conformity with the practice laid down in Royson's Case and in Styles' Practical Register
(1657).
In Royson's Case, supra, it was held that "Persons who forswear themselves in justifying bail before a judge, are liable to the punishment of wilful and corrupt perjury; and if committedor confessed in court, may be sentenced immediately to the pillory, c."
In In re Charlton, supra, a scandalous letter was written by a barrister to a Master. It was brought to the attention of the Chancellor who held the writer in contempt and committed him to the Fleet. The writer did not appear in court to answer the charge, but wrote a letter to the Chancellor admitting authorship of the letter to the Master. Had Charlton actually appeared and admitted the authorship of the letter in open court, there is no doubt but that the Chancellor would have committed him forthwith.
In both In re Merrill and In re Jenkinson, supra, the defendant admitted authorship of a letter which the Chancellor held contemptuous. Both letters were written outside the court and one was not even addressed to the court, but to the clerk in Chancery. Both were held to be contempts in facie curiae. In the Merrill Case Chancellor Walker said (at p. 283), "A contempt * * * in facie curiae * * * does not exclusively concern itself with contempt committed in the court room while the court is in open session." And in the Jenkinson Case the same Chancellor said, "The contempt with which we are here dealing is a direct criminal contempt. * * * Direct contemptsare those usually referred to as contempts in the face of thecourt (in facie curiae). But this does not mean that such contempt must be committed while *Page 424 
the judge is presiding in open session in the courtroom." There is no doubt in my mind but that the Chancellor might have called Merrill and Jenkinson in the court room and inquired, "Did you write this letter?" And upon an affirmative answer being given, could have said, "Take him away, sheriff," or "Take him away, sergeant." (Five Knights' Cases, How. St. Tr. 111, 148). He could have committed them instanter. Oswald 136. "The law enables the court or a judge to send an offender to prison for contempt of court with a rapidity which may be described as `oriental.'" Oswald 8. The Chancellor did not choose to act in this summary manner but followed the modern practice of issuing an order to show cause. But he nevertheless had the power. A recent example of the exercise of this power occurred during the contempt proceedings before Vice-Chancellor Stein in theWestinghouse Case. The title of that proceeding was "In the Matter of Richard Lynch, et als., Charged with Contempt." It was heard before Vice-Chancellor Stein and a jury in Newark on March 6th, 1946. During the hearing a woman circulated a scurrilous circular outside the court house. She was sent for and brought in by an officer, questioned by the Vice-Chancellor, and upon admission of the offense in open court she was committed to jail forthwith.
This contempt proceeding is referred to by counsel for the defendant in connection with his citation of R.S. 2:29-77.6 as an example of permissible legislative limitations upon the powers of the courts to punish for contempt. But that statute does not apply to contempts in facie curiae; and the Court of Errors and Appeals in considering the appeal from the decision of Vice-Chancellor Bigelow in the Westinghouse Case (138 N.J. Eq. 3) did not pass upon the constitutionality of R.S. 2:29-77.6
(139 N.J. Eq. 97). That question was not involved either in the Court of Chancery or in the Court of Errors and Appeals. InBijur, c., Co. v. International Association of Machinists,92 N.J. Eq. 644, and Decatur v. Young, 92 N.J. Eq. 635, the Court of Errors and Appeals held that P.L. 1909 ch. 178 p. 270
did not conflict with any provision of our constitution relating to the jurisdiction of the Court of Chancery. Those decisions were in line with Staley v. *Page 425 South Jersey Realty Co., 83 N.J. Eq. 300. But that statute did not purport to be a limitation on the jurisdiction of the Court of Chancery. It merely granted a right of appeal from a judgment of that court. In the Bijur Case, the judgment was affirmed and in the Decatur Case, the judgment was reversed, both on the merits. There was no challenge to the jurisdiction of Chancery. The challenge was to the jurisdiction of the appellate court. However, provisions similar to those contained in R.S.2:29-77.6 with respect to jury trials have been held invalid as unconstitutional limitations on the inherent powers of courts of record in contempt matters by the courts of last resort in both New Hampshire and Massachusetts. See In re Opinion of theJustices (N.H.), 166 Atl. Rep. 640, and In re Opinion ofthe Justices, 275 Mass. 580; 176 N.E. Rep. 649.
I conclude that there is no valid statutory limitation on the inherent right of the Chancellor to make references to Masters and other assistants; that when a Master, by whatever name he is designated, hears a cause for the Chancellor pursuant to a reference by the Chancellor or by his authority, he is pro hacvice the Chancellor; that the perjury or false swearing here complained of was a contempt in facie curiae, and punishable as such. The second defense cannot prevail.
 3. NO JURISDICTION.
Counsel for defendant bases his argument in support of this defense on R.S. 2:15-1. He says in his brief, "The Vice-Chancellor herein has no jurisdiction to adjudicate this cause," and cites the statute in support of this statement.
The first section of the cited statute reads as follows:
"What constitutes contempt in general.
"The power of any court of this state to punish for contempt shall not be construed to extend to any case except the:
"a. Misbehavior of any person in the actual presence of the court;
"b. Misbehavior of any officer of the court in his official transactions; and
"c. Disobedience or resistance by any court officer, or by any party, juror, witness or other person to any lawful writ, process, order, rule, decree or command of the court." *Page 426 
The source of this statute is P.L. 1917 ch. 37 p. 71.
Perjury is "misbehavior" within the meaning of the statute. ReSteiner, 195 Fed. Rep. 299. In this case it was expressly held that perjury by false affidavits was "misbehavior" in the presence of the court, although the affidavits were not filed by the affiants but by counsel for some of them. And in New Jersey perjury has been repeatedly held to constitute a contempt of court. In my judgment any conduct of a witness which tends to obstruct the course of justice is misbehavior within the meaning of this statute. The statute is not a bar to this proceeding.
It is argued that as the alleged contempt was not committed "in the actual presence of the court so held by the Vice-Chancellor," the defendant may not be punished by this court. I have already held that the defendant's offense was committed in faciecuriae. Therefore, R.S. 2:15-1 does not apply. In re Merrill,supra.
But, it is also argued that the statute is a modification of the common law and that section 12 of the act delimits the power of the Vice-Chancellors in matters of contempt. I am unable to follow counsel's argument. In his main brief he says the statute modifies the common law in matters of contempt, but in his "Reply Brief" he says the statute is "the assertion of the right by the legislature and not a limitation of the power." I presume he means the "right" and "power" of the court to punish for contempt. If the act was declaratory, merely, we need trouble ourselves no more with it. A restrictive legislative declaration of the constitutional powers of this court is no more effective than an attempted legislative limitation of those powers. They both amount to the same thing. If the statute was intended as a limitation upon the constitutional powers of this court, then it is completely ineffective for that purpose, because the legislature cannot impair the jurisdiction of a constitutional court. Flanigan v. Guggenheim Smelting Co., supra. The 1917 act has been held to be unconstitutional in so far as it may be claimed to apply to this court (In re Bowers, supra), and so far as this court is concerned, the question is not an open one. Section 12 is of no greater force. *Page 427 
"All superior courts of record, civil and criminal, possess inherently and independent of statutory authority, the power to punish for contempt." In re Merrill, supra; citing In reKerrigan, 33 N.J. Law 344; Rhinehart v. Lance, 43 N.J. Law 311,313.
Defendant's counsel, in his brief, concedes that the Court of Chancery, "has inherent power to punish for contempt independently of the legislature and that the legislature may not curtail or attenuate that power." I agree that the power may not be curtailed by the legislature, but not that it may not be extended. State of New Jersey, ex rel. State Board of MilkControl v. Newark Milk Co., 118 N.J. Eq. 504.
The power is as ancient as the courts to which it is attached and "as ancient as any other part of the common law." Rex v.Almon, Hil., 5 Geo. III 1765, 97 Eng. Rep. 94.
As to the antiquity of the offense and the power to punish, see6 Bracton (Twiss ed.) 481; Sparks v. Martin, 1 Vent. 1
(1668); Fox's History of Contempt 1, 46; Prynn's Case
(1691), 5 Modern 460. Glanville cites instances of contempt as early as 1187 (Fox 57). Most of the reported cases on contempt are later than 1640 when the act for the abolition of the Star Chamber was passed. Fox 93; Styles' Practical Register
(4th ed.) 59, tit. "Amercement, Contempt;" Hudson, StarChamber; Collect. Jurid. 11, 148; Heath v. Paget (1660), 1Leving 2. And, see, Oswald, Contempt of Court, 3, 11, "The origin can be traced to the time when all the courts were divisions of the great Curia Regia — the Supreme Court of the Sovereign" — per Cockburn, C.J., in Regina v. Lefray, L.R. 8Q.B. (at p. 137), and sub nom. Ex parte Lefray, 42 L.J.Q.B.
(at p. 123).
The leading case on procedure for the punishment of contempt of court, and the root of the present practice in cases of criminal contempt is Rex v. Almon, supra. In Judge Wilmot's opinion in that case, written in 1765, it is laid down that a libel on a judge in his judicial capacity is punishable by the process of attachment, without the intervention of a jury, and that this summary procedure is founded on immemorial usage. Fox 5.
Although Judge Wilmot's opinion in the Almon Case was not filed or delivered in court (see *Page 428 
note to 97 Eng. Rep. 94) it was recognized in England as early as 1821 as stating the common law rule at the time it was written, in 1765. Rex v. Clement, 4 Barn. Ald. 218; SeeRoach v. Garvan (1742) 2 Atk. 469; Harrison's Case
(1638), Cro. Car. 503; and see the long list of cases cited in Fox's History of Contempt (at pp. 30 and 31), in which the Wilmot doctrine was approved and applied. The practice had been previously established by Lord Hardwick as early as 1742.Fox 117.
There is no doubt in my mind on the question of my jurisdiction, as Vice-Chancellor, to hear the instant application. The third defense cannot prevail. The procedure outlined by the accepted authorities has been strictly followed and as this is a proceeding in criminal contempt, the defendant has been accorded "all of the substantial rights of a person accused of crime that are consistent with the summary nature of the proceeding." Staley v. South Jersey Realty Co., supra.
I find the defendant guilty of contempt of court as charged. *Page 429